MARINE MIDLAND TRUST COMPANY OF NEW YORK, as Successor Trustee under Indenture of Mortgage, Plaintiff, *v.* FORTY WALL STREET CORPORATION et al., Defendants. (And Two Other Actions.)

WEBB & KNAPP, INC., et al., Appellants; FORTY WALL STREET BUILDING, INC., Appellant-Respondent; HERBERT L. BRICKMAN et al., Respondents-Appellants; WINTHROP, STIMSON, PUTNAM & ROBERTS et al., Respondents.

First Department, April 13, 1961.

Allen T. Klots of counsel (*Silas M. R. Giddings* and *William R. Delano* with him on the brief; *Winthrop, Stimson, Putnam & Roberts,* attorneys), for Webb & Knapp, Inc., appellant.

*Moses Polakoff* of counsel (*Herbert L. Brickman,* attorney), for Herbert L. Brickman, in person, and others, appellants.

*Jacquelin A. Swords* of counsel (*Cornelius W. Wickersham* and *George M. Vetter, Jr.,* with him on the brief; *Cadwalader, Wickersham & Taft,* attorneys), for Forty Wall Street Building, Inc., appellant-respondent.

*David W. Peck* of counsel (*Sullivan & Cromwell,* attorneys), for Kissam & Halpin and another, respondents-appellants.

*Charles Trynin* of counsel (*Irving Steinman* with him on the brief; *Charles Trynin,* attorney), for Norman E. Blankman and others, respondents-appellants.

*Samuel Rosenberg,* respondent-appellant in person.

*Mortimer A. Shapiro* of counsel (*Aaron Schwartz* with him on the brief), for Nemerov & Shapiro, respondent-appellant.

*Israel Beckhardt,* respondent-appellant in person.

*Bernard A. Saslow* of counsel (*Daniel W. Blumenthal* with him on the brief; *Lynton & Saslow* and *Maurice B. & Daniel W. Blumenthal,* attorneys), for Paul Benton and others, respondents.

*David L. Charal,* respondent in person.

BOTEIN, P. J.  Upon a joint record in this combination of an aborted derivative stockholders' action and a completed Burchill Act reorganization proceeding (Real Property Law, §§ 119–123), ten appeals are taken by various parties, all addressed to the adequacy of allowances to attorneys and appraisers.

The Burchill Act proceeding, to reorganize the subject real property which secured publicly held trust mortgage bonds, was originated in 1939, but was reactivated more recently by recourse to a provision in the 1940 judgment of reorganization retaining jurisdiction in the court to reopen the proceeding for certain purposes. The 1940 reorganization had resulted in the incorporation of Forty Wall Street Building, Inc., which had taken title to the property securing the trust mortgage, located at 36–42 Wall Street, in the Borough of Manhattan. This corporation had issued its stock to the bondholders in exchange for their bonds.

Prior to October 1, 1957, defendant Webb & Knapp, Inc., had acquired two thirds of the stock of Forty Wall Street Building, Inc. By notice dated October 11, 1957, at the request of Webb & Knapp, Forty Wall called a special meeting of stockholders for October 25, 1957, to consider a proposal made by Webb & Knapp that the assets of Forty Wall be offered for sale at public auction, with a minimum upset price of $15,000,000. Webb & Knapp itself agreed to pay at least this amount.

This proposal precipitated two stockholders' derivative actions, which sought, among other things, to enjoin the proposed auction sale. In view of the short interval of time before the date of the stockholders' meeting, the attorneys for the two plaintiffs were required to telescope legal services that would ordinarily be performed in several months into a few driving days. They were successful in procuring orders enjoining the proposed auction sale *pendente lite,* and further providing that any of the parties might apply to the court, pursuant to its retained jurisdiction in the Burchill proceeding, for further instructions with regard to the proposed sale.

Accordingly, Forty Wall petitioned the court in the Burchill proceeding for a determination as to whether the subject premises should be offered for sale, and if so, upon what terms and conditions. It also moved for consolidation of the derivative actions with the Burchill proceeding. The Justice presiding at the Additional Special Term for Trust Mortgages appointed a Referee to inquire into the value of the property and report as to whether it should be offered for sale; and he reserved decision on the application for consolidation.

Hearings were held on 16 separate days before the Referee. Thereafter he recommended that the property be put up for sale at public auction, at an upset price of $17,000,000. The Additional Special Term confirmed the Referee's report, consolidated the derivative actions with the Burchill proceeding and dismissed the former. On October 27, 1959, the property was offered for sale at public auction with an opening price of $17,000,000, and after spirited bidding was sold to Webb & Knapp for $18,150,000.

Application for awards of fees and disbursements in the derivative actions and Burchill Act proceeding were then made by counsel and real estate appraisers, who participated either in the derivative suits, the reorganization proceeding hearings, or both.

The principle is now too firmly established to require discussion that a stockholder bringing a successful derivative action that benefits the corporation is entitled to reimbursement for expenditures necessarily made or incurred in the prosecution of the action. And it is generally recognized that almost invariably plaintiff stockholders and their attorneys arrange that counsel fees will be contingent upon success, and paid from corporate funds, not by the stockholder clients. If stockholders had to pay or commit themselves to pay lawyers to prosecute lawsuits on behalf of a class constituting a number of other uncommitted stockholders as well as themselves, it is unlikely that many derivative actions would be instituted.

For the same reasons, arrangements to pay counsel representing bondholders or, as here, stockholders once bondholders, in a Burchill Act reorganization proceeding are also uniformly made on a contingent basis. The outcome is not as speculative in a Burchill Act proceeding, however, for unlike most derivative actions, the fund from which fees are to be paid is already in existence; and the criteria justifying the payment of fees in a Burchill Act proceeding are much easier to fulfill. Section 122 of the Real Property Law provides that the expenses and compensation of " any committee or person who shall have submitted a plan of reorganization or modifications thereof shall be fixed at such sum as the court may deem reasonable ". The only contingency, therefore, that might defeat an application for compensation in a Burchill Act proceeding is that the court may find that the applicant has contributed nothing to the ultimate result of the proceeding.

So generally, and most pointedly in these particular consolidated matters, the attorney for a successful plaintiff in a derivative stockholders' action should receive a larger fee than an

attorney rendering similar services in a Burchill Act proceeding. It therefore becomes important to determine whether this is exclusively a derivative stockholders' action, as contended by the minority opinion; and if not, to allocate the services rendered between the two types of litigation.

As a catalytic aid in resolving this question, we should ask what would have happened had this litigation ended with the termination of the derivative action — namely, the granting of the injunction restraining temporarily the sale proposed by Webb & Knapp. Certainly no business enterprise of the size of the office building comprising the subject property could be left in such an indeterminate condition. The parties had to proceed further, to find whether the property should be sold, and if so, for what price, and upon what terms and conditions. The temporary injunction was a major victory, but a victory which, like Antietam, could be frittered away by inaction.

As the minority opinion states, these "are the exact issues that would have been litigated had the injunction proceeding gone to trial." But the Justice at Special Term who granted the temporary injunction, the Justice who reopened the Burchill Act proceeding, and all of the parties to the initial action and the later proceeding, clearly intended that those "exact issues" should be litigated instead in the Burchill Act proceeding. In his opinion granting the temporary injunction the Justice at Special Term made specific and pointed reference to the retention of jurisdiction under the 1940 Burchill Act proceeding, "to pass upon the merits of a sale of its property ending its existence." After noting the appropriateness of the Burchill Act design to determine the issues remaining to be litigated, he went on to say: "Here, it will be noted there was an express reservation of jurisdiction with regard to any and all applications as might from time to time seem necessary 'fully to consummate and carry out' the plan of reorganization. The final act of consummation of the plan is, of course, the sale of this property."

The court had ample authority to litigate the unresolved issues and effectuate a sale under the Burchill Act. It would, therefore, be grossly unfair to some of the lawyers and experts who expended substantial time and effort in that proceeding to hold that their compensation must be fixed, perhaps denied them, under rules governing allowances in derivative actions which everyone in those cases had virtually abandoned.

The Burchill Act formula was uniquely adapted to resolve the impasse created by the granting of the temporary injunction in the derivative action. The statutory reorganization procedures of the Burchill Act were created in 1933 to furnish

a pattern of protection to real estate bondholders — mostly small investors — whose investments were mired in a depressed real estate market. To cope with the varied and manifold problems posed in those critical times, the court was endowed with very broad powers placing a premium on creativity and resourcefulness — all subject, however, to bondholder approval. The court and interested parties could explore and command the situation much more comprehensively and creatively than if the derivative action had been pursued to its conclusion. We are persuaded that court and parties adopted the sensible course in electing to turn from the derivative action to the Burchill Act proceeding. And in any event, and as a practical consideration in reviewing these allowances, it is highly unlikely that the cost to the corporation of litigating the derivative actions to their conclusion would have been less than the cost of the Burchill Act proceeding. Courts and counsel appear to have become conditioned to the granting of more generous allowances in the former than in the latter.

It would be most unrealistic, therefore, and unfair to the corporation, to hold with the minority opinion that this litigation was in effect all one unrelieved derivative action. The services rendered must be allocated to the related yet separate derivative action and reorganization proceeding, and a much higher scale of compensation allowed in the former than in the latter. This holds true particularly on the instant appeal, since the Burchill Act proceeding developed into nothing more than an appraisal proceeding.

Upon our holding that a separate Burchill Act proceeding ensued, the attorneys for the majority stockholder are entitled to an allowance for services rendered in that proceeding in which they contributed importantly to the evolution of the plan of sale. They are not entitled to compensation for their role in the derivative action, in which they opposed the granting of the temporary injunction.

The applications for allowances to the two appraisers retained by the stockholder plaintiffs in the derivative actions, who also testified as experts in the reorganization proceeding, pose some problems. First, the common law and the Burchill Act provide that the plaintiff in a derivative action and any person or committee submitting a plan in a Burchill Act proceeding, will be entitled to reasonable expenses incurred in the prosecution of his claim. If followed literally, the lawyer would prepare his own affidavit of services and his estimate of their value, together with those of experts or others entitled to compensation, submit them to the client and then to the court with an approving

affidavit of the client. This idle ritual has not been required by courts because it would merely encumber the record needlessly. The court, not the client, assesses the value of the services rendered on a contingent basis. It does not evaluate the skill and time expended and the results achieved on the client's notion of their value. If the lawyer or expert should be required to submit a bill in specified amount to the client, then further complications ensue. It would aid the court only if submitted on the basis of an amount previously agreed upon with the rare client who would thus commit himself absolutely; and then would probably be considered by a court only to set a ceiling on the allowance. When the allowances are sought on a contingent basis, as were all those requested here, there is no point to channeling the applications through laymen.

Contingent retainers are indigenous to this country. It is generally believed that the advantages they offer clients — particularly indigent ones — and to lawyers, overbalance the many forms of abuses to which they are susceptible. A pervasive apprehension about contingent retainers — whether with lawyers or experts collaborating in preparation or trial of cases — is that a person whose compensation is thus conditioned on success becomes a sort of joint adventurer with the party hiring him in the litigation enterprise; and that such an arrangement conduces to perjury and other practices that will tend to pervert justice. The contingent retainer between lawyer and client is countenanced because the lawyer is an officer of the court, ordained and disciplined to deal fairly with court, client and adversary. Besides, it is assumed that a lawyer will be as scrupulous and honorable in the performance of his duties, and will labor as devotedly and diligently in the interests of a client, whether he is paid an absolute fee or whether his compensation hinges on the successful outcome of the lawsuit.

A similar confidence does not embrace nonlawyers. Nevertheless, accountants, and less often, appraisers, have been consistently, without demur, awarded allowances in derivative actions and their variants on a contingency basis. As is the case with lawyers, stockholders or bondholders suing in derivative actions or Burchill Act proceedings cannot undertake to pay the substantial fees earned by accountants, appraisers and experts in other fields. In such litigation the complaining security holder seldom possesses the ability to match the enormous resources of management, which can commit itself to the payment of large fees absolutely. And yet, without the services of such experts, meritorious cases may be prejudiced seriously or destroyed.

Except for a long-standing, unarticulated acquiescence in payment of contingent fees to experts for these pragmatic reasons, there appears to be no body of law relating specifically to this subject. There are cases that stamp as illegal agreements to furnish evidence or to testify in order to establish a claim in litigation to be commenced (*Wellington* v. *Kelly*, 84 N. Y. 543; *Lyon* v. *Hussey*, 82 Hun 15; *Cowles* v. *Rochester Folding Box Co.*, 179 N. Y. 87). See in this connection *Bergoff Detective Serv.* v. *Walters* (239 App. Div. 439), in which the solicitude of the law with the maintenance of the marital relation was an added consideration in holding a contract intrinsically illegal which provided for compensation to a private detective agency contingent upon success in procuring evidence as to adultery on the part of a wife.

In *Hough* v. *State of New York* (145 App. Div. 718) an agreement to pay an appraiser a stated sum provided his appraisal was substantially less than that of the expert for the adversary party was held to be against public policy and unenforcible. And in *Matter of Schapiro* (144 App. Div. 1), the respondent attorney was disbarred for agreeing, among other things, to pay a doctor a substantial portion of the recovery to testify in a negligence action. The gravamen of the charges was, first, that the amount to be paid the doctor in the event of success was to secure his testimony to a particular set of facts; and second, that the respondent allowed the doctor to testify that he had no interest in the recovery and no understanding as to what his compensation would be.

In other jurisdictions it has been held that an agreement to compensate a witness conditioned upon recovery is not illegal nor against public policy; but can be shown upon the trial to establish bias or otherwise affect the credibility of the witness (*Lack Malleable Iron Co.* v. *Graham*, 147 Ky. 161; *Reed* v *Firemen's Ins. Co. of Newark*, 78 N. J. L. 549; *Provident Sav. Life Assur. Soc.* v. *King*, 216 Ill. 416).

While some of the general pronouncements in these New York cases might seem to stamp all contingent fee arrangements made with a witness illegal and as against public policy, each case turned on some unconscionable circumstance that is not even suggested in connection with the retention of the two appraisers whose allowances are under review. In the first place, they were hired to advise the claimants, and if needs be, testify. There is nothing in the record to indicate they were hired to advise and testify as to anything but their honest opinions as to the value of the property. They had no hand in fostering the litigation; and their compensation was not fixed between them and the

parties in any sum or percentage dependent upon success, but was to be in an amount allowed by the court. This amount presumably would be reasonable and not immoderate, and would reflect, among other things, the experience, skill and standing of the appraisers, the contribution they made to the litigation complex in reaching a right result, and the time expended. Furthermore, they testified only in the Burchill Act proceeding, and performed a substantial part of their preparation and gave considerable advice to the original plaintiffs in that area of the consolidated matters. By the time the litigation moved into its reorganization phase, the fact that they would be compensated, although not in what amount, was well assured. Certainly, the Judge in considering their testimony was fully aware of the fact that they had not been promised a fee by their clients, that they would look to him for compensation, and that in this aspect of the litigation such compensation would be measured by the fairest contribution they could make to the promulgation of the most desirable and feasible plan of reorganization. Under the circumstances, the allowances made to the appraisers should not be disturbed.

The allowances to the Referee and the court-appointed appraiser were made more than half a year before the allowances brought up on this appeal — upon the motion to confirm the Referee's report. We appreciate that some Justices at Special Term have followed this practice. We deem it more appropriate, however, that there be a uniform procedure in this regard; and are unanimously and firmly of the opinion that allowances to Referees and court-appointed experts should be made subsequent to the filing of the order granting all other allowances.

We are of the opinion that some of the allowances should be modified or eliminated. The allowance to Charles Trynin and Irving Steinman is reduced to $75,000, that to Lynton & Saslow, M. B. and D. W. Blumenthal is reduced to $75,000, the allowance to Nemerov & Shapiro is reduced to $7,500, and that to Israel Beckhardt is reduced to $3,500. The awards made to Herbert L. Brickman, Samuel Rosenberg and David L. Charal are stricken in their entirety. The three attorneys last mentioned did not participate in the stockholders' derivative actions which led to the reopening of the 1939 Burchill Act proceeding. They contributed nothing to the development of the plan for liquidation of the mortgaged property which was ultimately recommended by the Referee and approved by the court below. In fixing these awards we reiterate that we regard the services rendered in the abbreviated stockholders' derivative actions, prosecuted as

they were under the urgency of time pressures resulting from the threatened sale of the property, as much more valuable than those rendered in the protracted Burchill Act hearings. The Burchill Act hearings were in essence an appraisal proceeding. They were devoted almost exclusively to the relatively narrow problem of the fair upset price to be fixed upon the sale of the property, after short shrift was made of the issue as to whether a sale of the property was in the best interests of the corporation and its security holders.

The appeals of Webb & Knapp, Inc., and Isaac, Mildred, Louis and Harry Blank, to the extent that they attack the propriety of certain allowances on the ground of excessiveness, are dismissed. Without passing upon the possible standing of stockholders to appeal from allowances made to others under certain circumstances in some derivative actions or reorganization proceedings, we hold that the above-mentioned appellants, in the positions they advance upon this appeal, are not aggrieved parties in respect of allowances made to other applicants (*Matter of Hotel St. George Corp.*, 277 App. Div. 1125).

The order dated January 20, 1960, should be modified as indicated, on the law, the facts and in the exercise of discretion, and otherwise affirmed, without costs to any of the parties.

STEUER, J. (dissenting). The fees awarded pursuant to the order of January 20, 1960, can only be reviewed after reaching a determination of the nature of the action. Concededly, the action is either to be regarded as a stockholders' derivative action or as a proceeding pursuant to the Burchill Act. The several parties to this suit were in accord upon the propositions that the method of determining fees in the two classifications of actions differs radically one from the other. It was furthermore the opinion of all parties concerned, and we believe it to be the established law, that the fees in a derivative action are altogether contingent. Of course, any party may agree with his own attorney upon what is to be paid for services rendered, but if the attorney is relying upon an award from the corporation he must establish that the corporation benefited financially as a result of the action and that his services contributed directly to that result. Failing such proof, he is not entitled to an award. Present such proof, the award is based upon a percentage of the gain to the corporation. In this case giving consideration to all the factors, 20% of the sum involved would appear to be a proper allowance. It further appears that no serious objection to this percentage was made by any of the parties involved. In a proceeding under the Burchill Act altogether different considerations govern the fixation of fees. There, fees are awarded

to attorneys for all parties who have aided or assisted the court in reaching a determination and fees are awarded upon a *quantum meruit* basis, generally represented by a more or less rigid allowance for each hour consumed in the work.

The course of this proceeding makes the determination of its nature a difficult question, but upon this application it is nevertheless one that must be decided. The action arose out of a desire on the part of Webb & Knapp, majority stockholders of the corporate defendant, to acquire the building owned by the defendant. To this end they proposed purchasing the building either at private or public sale and, in the event of a public auction, they offered as an upset price $15,000,000. This proposal brought immediate response from two sets of stockholders, one represented by Kissam & Halpin, Esqs., and the other by Lynton & Saslow, Esqs., both of which firms are claimants upon this appeal. Each started a derivative action in which it was sought to enjoin the proposed sale. The court granted a temporary injunction restraining the proposed sale and leaving for disposition at the trial whether a sale at that time would be fair to the minority stockholders and, if so, on what terms. It appears, therefore, that the value of the building and the price to be paid for it were the primary issues to be litigated. Shortly thereafter an application was made on behalf of the corporation and the majority stockholders to order a sale of the building pursuant to the Burchill Act. It appeared that a proceeding under this act had been instituted in 1939 and that jurisdiction had never been formally relinquished. In the petition an order was requested fixing the terms upon which the building could be sold. The petition also sought consolidation of the two injunction proceedings with this proceeding. The court ordered a reference to determine the issues, namely whether the building should be sold and, if so, upon what terms. These issues are the exact issues that would have been litigated had the injunction proceeding gone to trial. Upon the return of the Referee's report, the three actions, that is, the two injunction proceedings and the proceeding under the Burchill Act, were consolidated. The injunction actions were dismissed and an auction sale of the building pursuant to the Burchill Act was ordered. The upset price for the sale so resulting was fixed at $17,000,000, and the property was sold at auction for $18,150,000.

While the steps taken after the return of the Referee's report might seem to indicate that this was a proceeding under the Burchill Act, in reality that does not appear to have been the fact. Had the minority stockholders not brought their injunctive actions, it is extremely unlikely that the quiescent proceeding

under the Burchill Act would ever have been revitalized. In practical effect, nothing was added either to the proceeding itself or to the relief obtained under it by virtue of the injection of the Burchill Act action into the pending lawsuits. The same questions would have been litigated by the same parties and presumably with the same results. No valid distinction can result from the fact that if the injunction proceedings had been tried the trial would probably have been before the court rather than a Referee. For these reasons it is concluded that the fees to be fixed should be fixed in accordance with the recognized procedures in derivative actions.

The next question that is presented is what gain resulted to the corporation from this proceeding. It is, of course, impossible to determine what the eventual sale price would have been upon the auction even if no action had been brought. It is, however, reasonable to assume that the change in the upset price had a considerable influence upon the amount eventually realized. That change amounted to $2,000,000, and 20% thereof is $400,000.

The attorneys whose services resulted in this increase were primarily those who brought the two injunctive proceedings. Of these the record indicates that the major portion of the work was done by the firm of Kissam & Halpin. It is believed that in fairness they would be entitled to 50% of all fees involved. This would result in an increase from the fee awarded them, $150,000 to $200,000. Messrs. Lynton & Saslow, who would be entitled to the bulk of the remainder, were awarded a fee of $90,000, from which they have not appealed. We believe that this figure should stand. An additional contribution was made upon the arguments of the injunction by Charles Trynin, attorney for a committee of stockholders called the Blankman Committee, which we believe had a value of 15% of the total fee, and the fee to them should be $60,000.

The balance of the attorneys, with one exception to be noted, held what our English brethren describe as waiting briefs. They appeared for various stockholders and either approved the course of the proceedings in silence or made contributions which cannot be described as having had any effect upon the ultimate result. It is felt that their services were rendered peculiarly to their own clients and, aside from the protection that their presence gave to those stockholders, no benefit to the corporation generally can be ascribed. The exception noted above is the firm of Winthrop, Stimson, Putnam & Roberts, who throughout represented the majority stockholder. It was their function, which they performed with appropriate skill and propriety, to oppose the applications made by the various minority inter-

ests. Their services were rendered exclusively to their client and did not contribute to the creation of the fund and, in fact, were designed to prevent any increase in that fund. Under the conclusions reached above, it is obvious that they are not entitled to an award from the corporate funds.

The opposition to the fees awarded comes from the corporation and from the last-mentioned attorneys representing the majority stockholder. As noted in the majority opinion, the latter have no standing to object and their appeal has been dismissed. While the corporation in its brief and argument expressed no objection to the award to these attorneys representing the majority stockholder, their notice of appeal brings the award up for review. The facts having thereby come to the attention of the court, it is the latter's duty to the minority to enforce the applicable principles. (See *Kavanaugh* v. *Kavanaugh Knitting Co.*, 226 N. Y. 185, 196.)

In addition, two awards were made to real estate appraisers. Allowances in a derivative action were formerly controlled by section 61-a of the General Corporation Law (L. 1941, ch. 350). The section provided for allowances for the expenses, including attorneys' fees, of parties to the action. In 1945 article 6, which included this section, was revised and the section deleted. The notes of the Law Revision Commission show that so much of the former section as was not re-enacted was omitted because the section merely expressed the existing common law as to which no change was intended. (See Notes of Commission, N. Y. Legis. Doc., 1945, No. 65 [E], pp. 4, 6.) The pertinent direction of the law is that the allowance is to be made to a party to the action. For some time Special Term has made allowances to accountants and, more recently, to appraisers.

The majority opinion collates the authorities on the subject of contingent fees to witnesses. It may well be that this is the most important question involved in these appeals. As stated, the contingent fee as applied to lawyers is an indigenous product of American litigation. It is our answer to the problem presented by the impecunious suitor. It is far from an ideal answer, or an unmixed blessing. Without arguing the merits of the case of the contingent fee as applied to legal counsel, and conceding that the practice of allowing counsel to apply for fees on their own behalf is a departure from the common-law rule as it was formerly codified in the statute, we agree that the departure is entirely justified.

But now we are asked to take an additional step, and to apply that same procedure to witnesses. True it is that so far the witnesses are professional accountants and real estate apprai-

sers. And true it is that it is only an additional step, but one in the wrong direction. The authorities collated are, in this State at least, unanimous in their condemnation of any practice which makes the compensation of a witness dependent on the outcome of the litigation. Granted that, in each instance where the rebuke has been reported, there were additional factors of a reprehensible nature involved. But examination of those additional factors will show that they are the inevitable concomitants of the system itself — what you can expect if you allow the compensation of a witness to depend on the outcome of the litigation. The time of a professional witness can be bought; his opinion should not be vendable.

The question is rightfully posed whether these horrendous consequences stem from a practice of allowing a witness to apply on his own behalf for compensation when it is concededly proper for an application to be made by the party for the latter's expenses, which can include the compensation of the witness. In our opinion the distinction is more than one of form. When the witness makes his own application, he appears on his own behalf, and his claim is that he, by his testimony, rendered services to the corporation which, unless the testimony had a certain tenor, would not be compensable. He asks payment independent of any agreement with his client because his testimony accomplished a result. He does not look to be paid for his time but for what he swore was his opinion. The distinction between that and the party applying for his expenses is not a mere formality, nor can the practice be condoned either as a short cut or an economic practicality. Perhaps the practice does make the contest between the entrenched corporation and the generally less powerful stockholder more even. Should the leveling process be accomplished by sanctioning the use of poisoned weapons? We believe the rules should be adhered to and the practice abolished. The award to the expert witnesses should be vacated without prejudice to an application by the attorneys receiving awards herein for their disbursements in this connection.

The order should be modified in accord with the provisions above set out.

BREITEL and STEVENS, JJ., concur with BOTEIN, P. J.; MCNALLY, J., concurs in the following memorandum: I concur in the modification and the dismissals by the majority. I also concur in the dissenting opinion to the extent that it would deny the applications for allowances of the attorneys for the majority stockholder and the expert witnesses. STEUER, J., dissents in opinion.

Order, entered on January 20, 1960, fixing the amount of fees and disbursements to be awarded to the attorneys for the parties in these consolidated actions, modified as indicated in the majority opinion of this court filed herein, on the law, on the facts, and in the exercise of discretion, and, as so modified, affirmed, without costs to any of the parties. Settle order on notice.