In the Matter of Leo M. Shore, Individually and as Shareholder in Parklane Hosiery Company, Inc., et al., Respondents-Appellants; Parklane Hosiery Company, Inc., Appellant-Respondent.

Second Department, April 30, 1979

### APPEARANCES OF COUNSEL

*Goldman Cooperman & Levitt (Robert E. Goldman* of counsel), for appellant-respondent.

*Frederick J. Cuccia* and *Wisehart, Friou & Koch (Arthur M. Wisehart* of counsel), for respondents-appellants.

### OPINION OF THE COURT

MARGETT, J.

Parklane Hosiery Company, Inc. "went public" in 1968 by selling some 300,000 shares, out of a total capitalization of roughly one million shares, to the public at $9 per share. Effective control of the company was retained by the company's president, Herbert N. Somekh, and his affiliates through their ownership of more than 70% of the public corporation's stock. Six years later, in 1974, the "Somekh group" decided to return the corporation to private status by transferring their shares to a new corporation which would merge with Parklane, thus eliminating the "public" shareholders. This merger, the "overriding purpose" of which "was to enable Somekh to repay his personal indebtedness", was consummated in October, 1974. Those shares of stock not already owned by the new

corporation—i.e., those held by people outside the "Somekh group"—were each to be exchanged for $2 in cash *(Securities & Exch. Comm. v Parklane Hosiery Co.,* 422 F Supp 477, 482, affd 558 F2d 1083).

The merger spawned a number of lawsuits in both Federal and State courts,[1] including the instant consolidated appraisal proceeding, brought pursuant to section 623 of the Business Corporation Law. The issue before this court is a narrow one: Must the testimony of three of petitioners' expert witnesses be stricken on the ground that their fee arrangements—which include an understanding that they will receive no fee unless petitioners are successful—are violative of public policy.

Since June, 1975 a court appointed appraiser has taken the testimony of some 11 witnesses called by petitioners. The instant appeal involves the testimony of two certified public accountants, Dermott Noonan and Richard Pluschau, and a securities analyst, Nathaniel S. Weiner. On cross-examination of Mr. Pluschau, it was developed that there existed a letter, dated July 16, 1976, from petitioners' attorneys to his firm, which "confirm[ed]" an "understanding" as to the accounting firm's participation in this proceeding.

"The terms of such participation will include a *fee to be determined by the Court* subject to the understanding that such fee shall be no less than 20 percent of the total fee of the undersigned as co-counsel (provided that in no event may your fee exceed $175 per hour*). Any amount of your fee which exceeds that awarded by the Court will be treated by us as a disbursement to be deducted from the amounts payable to our clients from the recovery. (In the event there is no recovery, no fee will be owed to you.)" (Emphasis supplied.)

The asterisk appears before a footnote to the letter, which

---

1. An action by the Securities and Exchange Commission against Parklane and Somekh for violations of the Securities Act of 1933 and the Securities Exchange Act of 1934, was effectively terminated with the Second Circuit's affirmance, in 1977, of a District Court order directing Parklane to amend its prior filings with the SEC to correct certain misstatements and nondisclosures *(Securities & Exch. Comm. v Parklane Hosiery Co.,* 558 F2d 1083, affg 422 F Supp 477, *supra).* There is pending, in the District Court for the Southern District of New York, a class action in which the United States Supreme Court has held that the petitioner shareholders are entitled to partial summary judgment with respect to those issues which were resolved against Parklane in the action brought by the SEC *(Parklane Hosiery Co. v Shore,* 439 US 322). While we have no personal knowledge of any other litigation arising out of the merger, the opinion of Judge DUFFY (422 F Supp 477, 480), states that class actions in the Eastern District of New York, and in the New York Supreme Court, were pending at the time of that decision, viz., the latter part of 1976.

footnote states: "The amount is in recognition of the fact that the receipt of any fee by you is contingent upon a favorable result." The letter goes on to state that "you will not be asked to compromise your views as to the proper accounting standards and principles applicable to any assignments given to you." The letter is signed by two of petitioners' attorneys. The bottom of the letter contains a form for acceptance:

"Agreed to this __ day of July 1976
"Ferro, Berdon & Company
"By _____
       Matthew A. Berdon
          and

      _____
      Dermott Noonan"

Only Mr. Noonan's signature appears on the letter; the "acceptance" is undated.

Mr. Arthur M. Wisehart, one of the authors of the letter, explained that the letter reflected his representations to Mr. Berdon that the fee "would be an amount to be determined by the court".

"I explained this to Mr. Berdon, that if the court does not award a recovery for these petitioners, it's my understanding under the cases and practices that are practiced under the Business Corporation Law that there might be no fee, because it depends in part, as I read the cases, on the result." With respect to the "floor" of 20% of the fees received by counsel, Mr. Wisehart explained that the 20% was "not a part of the lawyers' fee."

"It provides that the fee would not be less than 20 percent, and if there were any deficiency between the amount as determined by the court and the fee itself, it would be treated as a disbursement deductible from the proceeds in the case."

Nathaniel S. Weiner, a securities analyst who testified in behalf of petitioners, was also cross-examined about his understanding as to payment of his fees. He testified that he had been approached by one of the petitioners, Jim Foster. The two of them had worked together at the same brokerage firm and had become good friends. Foster had "indicated that the shareholders had a limited amount of funds available" and that "under certain circumstances the fee could be awarded by the court."

When Weiner first agreed to become involved in this proceeding, it was his understanding that "appraisals normally did't take very long." It was agreed that they "would work out something reasonably on the fee, if it was simply a relatively minor job." There was "no formal arrangement". Weiner stated that his "understanding * * * at this point" was that he would "have to look to the fee awarded by the court."

"That's an understanding I have with Mr. Foster in the sense that we have subsequently discussed the matter of fees, and it is perfectly clear from the amount of time and work which I have had to devote to this case * * * it is self-evident, that there was no reasonable way that I could be compensated by the shareholders."

Based upon the foregoing "fee arrangements", Parklane moved Special Term, *inter alia,* for an order striking the testimony given by petitioners' three expert witnesses. It was argued that all three experts were to be paid on a contingent basis and that such arrangements are in violation of the Code of Professional Responsibility (for attorneys), the Professional Standards of the American Institute of Certified Public Accountants, and the public policy of this State. Petitioners cross-moved, *inter alia,* for an order requiring Parklane to pay reasonable interim allowances to petitioners' expert witnesses and attorneys with respect to their fees, costs and expenses.

Both motions were denied by Special Term. The court assumed, *arguendo,* for the purpose of its decision, "that the fees, if any, [that petitioners' experts] will be paid are dependent upon the outcome of this litigation" *(Matter of Shore v Parklane Hosiery Co.,* 93 Misc 2d 933, 935). Framing the issue before it in limited terms—whether "experts who are being paid a contingent fee [are] incompetent to testify"—the court held that "an interest in the outcome of a litigation, standing alone, does not render a person incompetent to testify" *(supra,* pp 935, 936). The public policy of this State with regard to the question of competency was found to be expressed in CPLR 4512, which provides generally that "a person shall not be excluded or excused from being a witness, by reason of his interest in the event". Special Term noted that "[t]he appraiser is a skilled and able attorney with many years experience, who is perfectly capable of evaluating the testimony in light of all the surrounding circumstances" *(supra,* p 938). As for petitioners' cross motion, it was held that the moving

papers were "insufficient to establish a need for the requested relief" *(supra,* p 940).

Parklane now appeals, as limited by its brief, from so much of Special Term's order as denied its motion to strike the testimony of the three expert witnesses. Petitioners cross-appeal as limited by their brief, from so much of the order as denied their motion for interim allowances. It is Parklane's position that Special Term's decision is in conflict with the public policy of this State in that it condones contingent compensation arrangements for the testimony of witnesses.

■ On this record we do not reach the question whether contingent fee arrangements for expert witnesses, in general, are violative of public policy. We confine ourselves to the evidence of the rather tentative "agreements", or understandings, in this appraisal proceeding. Contrary to Parklane's position, the understandings between petitioners and these experts actually reflect the public policy of this State as expressed in paragraph (7) of subdivision (h) of section 623 of the Business Corporation Law and in the relevant case law.

At common law, unanimous shareholder consent was a prerequisite to fundamental changes in the corporation, such as those brought about by merger *(Voeller v Neilston Co.,* 311 US 531, 535, n 6; 13 Fletcher, Cyclopedia of Corporations [1970 rev vol], § 5906.1; see *People v Ballard,* 134 NY 269). The common-law rule obviously hindered corporate mobility, was unjust in cases where it prevented corporate reorganizations deemed advantageous by a large majority of stockholders, and made it possible for an arbitrary minority to establish a nuisance value for its shares by refusal to co-operate *(Voeller v Neilston Co., supra,* p 535, n 6; *Matter of Timmis,* 200 NY 177, 181; 13 Fletcher, Cyclopedia of Corporations [1970 rev vol], § 5906.1; The Dissenting Shareholders' Appraisal Statute: Influence of Cost and Interest Provisions Upon the Efficacy of the Remedy, 50 Boston Univ L Rev 57). In response to these problems, statutes such as what is now section 903 of the Business Corporation Law (authorizing adoption of a plan of merger by a vote of two thirds of the outstanding shares entitled to vote thereon), were passed in all of the States (4 White, New York Corporations, par 903.01).

Passage of such "majority rule" statutes did, however, open the door. to the potential for victimization of minority shareholders *(Voeller v Neilston Co., supra,* p 535, n 6). The *quid pro quo* for the minority's loss of its veto power was the

enactment of statutes such as section 623 of the Business Corporation Law, which are intended to protect minority shareholders by affording them "fair and just compensation" where they dissent from action taken by the majority *(Anderson v International Mins. & Chem. Corp.,* 295 NY 343, 349-350). The protection afforded by section 623 is accomplished through an elaborate set of procedural steps to be followed by a dissenting shareholder in enforcing his right of appraisal (see 3 White, New York Corporations, par 623.05). Suffice it to say that once the shareholder has made a valid election to dissent (Business Corporation Law, § 623, subds [c], [f]), the statute provides that the corporation shall offer to pay what it considers to be the "fair value" of the dissenter's shares (Business Corporation Law, § 623, subd [g]). If the corporation fails to make such an offer, or if the shareholder fails to agree with the corporation's estimate of what the stock is worth, then the corporation may initiate legal proceedings "to fix the fair value of [the dissenter's] shares" (Business Corporation Law, § 623, subd [h], par [1]). If the corporation does not take the initiative in instituting the appraisal proceeding, the dissenter may bring such a proceeding himself (Business Corporation Law, § 623, subd [h], par [2]). The court is charged with fixing the value of the dissenter's shares and may, if it so elects, appoint an appraiser to receive evidence and recommend a decision on the question of fair value (Business Corporation Law, § 623, subd [h], par [4]).

The allocation of costs—including the fees of the appraiser, of counsel representing the parties, and of expert witnesses retained by the parties to support their contentions as to the value of the stock—is a very important consideration because of the dynamic effect it has on the efficacy of the appraisal remedy (The Dissenting Shareholders' Appraisal Statute: Influence of Cost and Interest Provisions Upon the Efficacy of the Remedy, 50 Boston Univ L Rev 57). The expenses incurred in litigating an appraisal proceeding can act as a deterrent to the individual shareholder, particularly if he does not own a large number of shares (see 15 Fletcher, Cyclopedia of Corporations [1973 rev vol], § 7165; see, also, Securities & Exchange Comm, Report on Study and Investigation of Work, Activities, Personnel and Functions of Protective and Reorganization Committees, 606 [1938]). A recovery in a meritorious proceeding might well be swallowed up by the dissenter's costs of proving his case.

The appraisal statute in this State seeks to deal with these practical impediments to full enjoyment of the remedy by providing, as a general rule, that the costs and expenses of the proceeding shall be assessed against the *corporation*. Only where the dissenting shareholders acted arbitrarily, vexatiously "or otherwise not in good faith", does the statute provide that such costs and expenses "may be apportioned and assessed * * * against * * * the dissenting shareholders" (Business Corporation Law, § 623, subd [h], par [7]; *Matter of Dimmock v Reichhold Chems.*, 41 NY2d 273). Although such "expenses" are defined to exclude "the fees and expenses of counsel for and experts employed by any party", the court is given discretionary power—to be exercised within guidelines which look to the good faith, or absence thereof, of the parties —to award such fees (Business Corporation Law, § 623, subd [h], par [7]; *Matter of Dimmock v Reichhold Chems., supra).* Those guidelines are as follows: "(A) that the fair value of the shares as determined materially exceeds the amount which the corporation offered to pay; (B) that no offer was made by the corporation; and (C) that the corporation failed to institute the [appraisal] proceeding within the period specified therefor" (Business Corporation Law, § 623, subd [h], par [7]).

The reported cases have focused on the first of these three criteria, and have freely awarded experts' fees to the dissenting shareholders where the fair value of the shares materially exceeded the amount which the corporation offered to pay for them *(Matter of Lipe-Rollway Corp. v Abrams,* 33 AD2d 1094 [fair value of $22.50 per share; offer of $19.75 per share; 14% increase over amount offered by corporation]; *Matter of Dynamics Corp. of Amer. v Abraham & Co.,* 6 AD2d 683, modfg 5 Misc 2d 652 [fair value of $19 per share; offer of $15 per share; 27% increase over offer; the Appellate Division, First Department, modified by *increasing* allowances to experts]; *Matter of Dorsey v Stern Bros.,* 31 Misc 2d 747 [fair value of $27.50 per share; $24 per share offer; 15% increase over offer amounting to $6,125]; see, also, *Matter of Dimmock v Reichhold Chems.,* 41 NY2d 273, *supra* [suggesting that upon remand, Special Term could re-open the question of counsel fees where the differential between $3.82, the amount offered, and $4.75, the found fair value (24% increase) totaled nearly $14,000]). It has been held that where the total amount of the excess of fair value over the corporation's offer is "not inconsiderable", the court should, in its discretion, award fees to the dissenters *(Matter of Dorsey v Stern Bros., supra,* p 749).

In the instant case, the understanding reached with these three expert witnesses was essentially that they would have to look to whatever fee was awarded by the court. Although a "floor" was set in the case of the accountants, it was tied to counsel fees which, as a practical matter, would also be based upon the exercise of the court's discretion. The tentative nature of the compensation arrangements here is underscored by the fact that the letter of July 16, 1976 was never "agreed to" by Mr. Berdon. Nor was the "acceptance" portion of the letter ever dated.[2] The provision for payment of any portion of the "fee which exceeds that awarded by the Court" would appear to relate back to the "floor" of 20%. We perceive no sinister implications in that proviso.

In a situation such as this, where the experts have agreed to look to the court, it is a truism that no fees will be awarded if the shareholders are "unsuccessful". Such lack of success would, in all probability, mean that the fair value of the shares did not materially exceed the corporation's offer. It is fair to say that the "contingency" complained of by Parklane —that no fees will be owed if there is no recovery—is simply a recognition of the law as it applies where the witnesses are content to look to the court for their fee.

The compensation to be paid these experts was not fixed between them and the parties in any sum or percentage dependent upon success (see *Marine Midland Trust Co. of N. Y. v Forty Wall St. Corp.,* 13 AD2d 118, 126-127, affd 11 NY2d 679). Nor is there any hint that these expert witnesses have been asked to do anything other than to give their honest opinions as to Parklane's financial statements and the value of Parklane's stock. Indeed, the letter of July 16, 1976 states that the accountants "will not be asked to compromise [their] views as to the proper accounting standards and principles applicable to any [given] assignments".[3] Although there

---

2. While principles of agency would probably make the letter binding upon the members of the accounting firm, it is instructive to note that the appraiser, Monroe Fink, Esq., took the position that the compensation arrangements had not been finalized. Mr. Fink requested that petitioners advise him when a final agreement had been reached, or that no agreement had been reached, if that were the case, immediately prior to the completion of his duties. The appraiser was quite correct in assuming that no final agreement had been reached with respect to a specific sum.

3. For an excellent analysis of the effect of contingent fee arrangements on the testimonial reliability of expert witnesses, see Note, Contingent Fees for Expert Witnesses in Civil Litigation, 86 Yale LJ 1680. The author concludes that "[j]udicial scrutiny of contingent fees, when added to the prospect of effective impeachment,

was no guarantee that any fees would be awarded by the court, the cases cited above indicate that the courts will generally award such fees where there is a material difference between the corporation's offer and the fair value of the shares—either in terms of a percentage difference (see *Matter of Dynamics Corp. of Amer. v Abraham & Co.*, 6 AD2d 683, modfg 5 Misc 2d 652, *supra)* or in terms of the total dollar amount of the excess of fair value over the corporation's offer (see *Matter of Dorsey v Stern Bros.*, 31 Misc 2d 747, *supra).* Here, even a $1 increase over the $2 per share offer would be material since such an increase would amount to 50% and some $30,000.[4]

The instant fee arrangements are substantially identical to those approved in *Marine Midland Trust Co. of N. Y. v Forty Wall St. Corp. (supra).* In that Burchill Act reorganization proceeding, the First Department noted that "[i]n other jurisdictions it has been held that an agreement to compensate a witness conditioned upon recovery is not illegal nor against public policy; but can be shown upon the trial to establish bias or otherwise affect the credibility of the witness" (13 AD2d, at p 126).

"[A]ccountants, and less often, appraisers, have been consistently without demur, awarded allowances in [stockholder] derivative actions and their variants on a contingency basis. As is the case with lawyers [where contingent retainers are totally accepted], stockholders or bondholders suing in derivative actions or Burchill Act proceedings cannot undertake to pay the substantial fees earned by accountants, appraisers and experts in other fields. In such litigation the complaining security holder seldom possesses the ability to match the enormous resources of management, which can commit itself to the payment of large fees absolutely. And yet, without the services of such experts, meritorious cases may be prejudiced seriously or destroyed" (13 AD2d, at p 125). While recognizing that "some of the general pronouncements in [certain] New York cases might seem to stamp all contingent fee arrange-

---

ensures that the contingent fee option would not reduce testimonial reliability substantially below levels associated with current methods of expert compensation" (86 Yale LJ, at pp 1698-1699).

4. Approximately 30,000 shares are involved in this proceeding. While certainly not dispositive of the question of fair value, it should be noted that Parklane's "book value" was over $4 per share on the relevant date. Petitioners' expert, Mr. Weiner, has testified that the stock was worth over $10 per share.

ments made with a witness illegal," the court noted that "each case turned on some unconscionable circumstance that is not even suggested in connection with the retention of the two appraisers whose allowances are under review" (13 AD2d, at p 126). It was found that there was "nothing in the record to indicate they were hired to advise and testify as to anything but their honest opinions as to the value of the property" (13 AD2d, at p 126).

On the record before us, it is unnecessary to decide, as Special Term did, that testimony need not be stricken no matter what the nature of the contingent fee arrangement.[5] An agreement to pay a certain percentage of petitioners' recovery would run afoul of both the Code of Professional Responsibility (DR 7-109 [C]) and the Professional Standards of the American Institute of Certified Public Accountants (rule 302). The latter rule provides, however, that "[f]ees are not regarded as being contingent if fixed by courts". While no comparable provision appears in DR 7-109, we hold that rule to be inapplicable where an attorney acquiesces in an arrangement whereby the witness agrees to look to the court for his fee. The arrangements considered at bar are neither unethical nor contrary to public policy. Indeed they reflect the public policy of this State in affording minority shareholders true access to the appraisal remedy which was enacted for their protection.

Finally, we hold that Special Term properly denied the branch of petitioners' cross motion which sought an award of interim allowances. Absent a final determination of the fair value of the shares, there is no basis upon which Special Term can exercise its discretion in awarding fees.

The order should be affirmed insofar as appealed from.

TITONE, J. P., LAZER and MARTUSCELLO, JJ., concur.

Order of the Supreme Court, Nassau County, entered April 18, 1978, affirmed insofar as appealed from, without costs or disbursements.

---

5. We are in agreement with Special Term's general observations to the effect that the trend of the law is that a witness' self-interest goes to his credibility and not to his competency (*Matter of Shore v Parklane Hosiery Co.*, 93 Misc 2d 933, 936; see *Coleman v New York City Tr. Auth.*, 37 NY2d 137; CPLR 4512). We would note, however, that these expert witnesses are not persons "interest[ed] in the event" within the meaning of CPLR 4512 because they had no antecedent relation to the event which is the subject of this proceeding (see *Wellington v Kelly*, 84 NY 543, 548-549).