**FAULKNER DRILLING COMPANY, INC., Appellant,**

v.

**Al GROSS; Endicott & Associates; and Robert S. Miller, Appellees.**

**Robert S. MILLER, Cross–Appellant,**

v.

**FAULKNER DRILLING COMPANY, INC., Cross–Appellee.**

Nos. 95–CA–1677–MR (DIRECT), 95–CA–1684–MR (CROSS).

Court of Appeals of Kentucky.

April 25, 1997.

---

Robert Lee Rose, Winchester, for Appellant/Cross–Appellee, Faulkner Drilling Company, Inc.

Ashley W. Ward, Lexington, for Appellees, Al Gross and Endicott & Associates.

Theodore E. Cowen, Lexington, for Appellee/Cross–Appellant, Robert S. Miller.

Before GUIDUGLI, HUDDLESTON and SCHRODER, JJ.

*OPINION*

SCHRODER, Judge:

This is an appeal and cross-appeal from a judgment entered pursuant to a bench trial

regarding an oral contract to drill a water well. Upon considering the various arguments proffered by the parties, the record herein and the applicable law, we affirm on appeal and reverse and remand on cross-appeal for a determination as to punitive damages.

Since the mid–1980s, appellee/cross-appellant, Robert Miller ("Miller"), has been involved in a residential development called the Andover Subdivision in Lexington. Andover includes a golf course with ponds, and is at the outer edge of the urban service area for Lexington. Adjoining the Andover property was a 33–acre tract of land which was located outside the urban service area. Miller and one of his partners retained this land for themselves to develop homesites thereon. Part of Miller's plan for his property was to have an "amenity pond" that would be visible from his home and that would provide a source of water to irrigate his property, which included some 40,000 trees he planted. According to the evidence, there were two possible ways of obtaining the water for this pond. One was to drill a water well on the homesite property, and the other was to pump water from the Andover Golf Course lake.

Appellee, Endicott & Associates, was an engineering firm retained for the Andover development and also to help develop Miller's homesite. In the fall of 1988, appellee, Al Gross, an engineer with Endicott & Associates, contacted appellant/cross-appellee, Faulkner Drilling Company, about the prospect of drilling a water well on Miller's homesite property. In December of 1988, Gross, as an agent for Miller, met with Paul Faulkner, the president of Faulkner Drilling Company, on Miller's property to discuss the possibility of drilling such a water well. At this meeting, it is undisputed that Gross told Faulkner that the water was to be used to fill an amenity pond and for irrigation. Faulkner then explained that he could drill a shallow well (80 to 140 feet) and if they did not strike water, they would have to drill much deeper (approximately 1,000 feet) into the Knox formation. The Knox formation is a geologic formation originating some five hundred million years ago when much of the land was under sea and which today still contains some sea water. Faulkner told Gross that drilling to the Knox would cost between $12,000 and $13,000. However, according to Gross, Faulkner guaranteed that they would get water from the Knox.

This initial meeting with Faulkner was the first time Gross had ever heard of the Knox and he made notes of his conversation with Faulkner that day. At trial, Gross testified that Faulkner never mentioned the risk of getting salt water or even raised the issue of water quality at this initial meeting. Conversely, Faulkner testified that he told Gross at this meeting that he could guarantee he could get water in the Knox, but could not guarantee the quality of said water.

The evidence established that Paul Faulkner had 40 years' experience drilling water wells. In particular, he had some experience with drilling to the Knox in the Bluegrass area. Some of these wells contained water usable for the purposes for which it was sought, but at least two of these wells contained unusable water due to the total dissolved solids therein. Total dissolved solids are the minerals and other chemicals that are typically solids but will dissolve in water. These include salt (sodium chloride), sulphur, iron and many other minerals. With water from the Knox, the principal dissolved solid is salt and the expert opinion evidence established that there was more than a reasonable probability of getting salt water when drilling to the Knox. The evidence further established that Faulkner knew that the level of total dissolved solids in the water affected the purpose for which the water could be used.

Based on the information he learned in this first meeting, Gross, as an agent for Miller, entered into a verbal contract with Faulkner Drilling Company to drill a water well on Miller's homesite property. On August 17, 1989, Faulkner drilled 200 feet into the site selected by Gross. When water was not found at that depth, with Gross' approval, the drilling continued into the Knox formation where water was found at 948 feet.

Subsequently, Faulkner had a test run on a sample of the water obtained. The test results were available on October 5, 1989 and

showed 3,456 parts per million of sodium—levels well above what could be used for an amenity pond and not including any other dissolved solids in the water. At trial, Faulkner asserted that at that time, he felt the water was of medium salinity and could be used through aeration as a settlement pond. However, in his deposition, Faulkner claimed he told Gross that the water was of such questionable quality that the well should be abandoned, which Gross denies.

After this first test on the water, Faulkner suggested that a pump be installed in the well. However, before installing the pump, Faulkner demanded payment from Gross for drilling the well. On October 10, 1995, Miller sent a check to Faulkner for $6,636. Faulkner then installed a pump in the well pursuant to the direction of Gross.

On October 25, 1989, the pump was installed, but the quality of the water obtained from the well was bad due to the high level of total dissolved solids. The well was pumped for a period of time thereafter, but the quality of water did not improve. Faulkner then demanded payment for the pump and a bill was sent to Al Gross and Endicott & Associates for $7,244.46 for the pump and installation.

Subsequently, Faulkner ran another test on the water which revealed a higher salt content than the prior test. Faulkner brought the results of this test to Gross' office on November 16, 1989 and suggested that Gross consult with Dr. Foree of Commonwealth Technologies, a company providing consulting services in various scientific areas. Gross testified at trial that this was the first time Faulkner had mentioned any problem with regard to water quality to him.

When Al Gross consulted with Commonwealth Technologies, Dr. Foree held out little hope for the usefulness of the water for Mr. Miller's purposes. More water was pumped and the water was repeatedly tested at a cost of $110. However, the water never reached a level even close to what could be used in an amenity pond or for irrigation.

By early January of 1990, it was apparent that the well could not be used and Faulkner offered at that point to drill two additional shallow wells, which Gross maintained Faulkner offered at his own expense. These wells were drilled in the winter of 1990 and both were dry. Faulkner then billed $2,170 for the two wells.

The evidence was in conflict as to whether or not Miller gave Faulkner an opportunity to remove his pump. In the end, Faulkner did not get the pump. Miller had the pump removed and also paid to have the well capped. Miller ultimately obtained the water for his pond by pumping it from the golf course lake.

On July 24, 1990, Faulkner Drilling Company filed a complaint against Gross and Endicott & Associates for breach of contract to recover what it was owed for drilling the well, installation of the pump, providing the pump and other materials, drilling the two shallow wells, and performing tests. Miller intervened in the suit as a defendant and counterclaimed against Faulkner, alleging fraud and misrepresentation and seeking punitive and compensatory damages. The case was tried before the court on April 3, 1995.

The trial court found that Faulkner knew of the risk of finding unusable water in the Knox and had a duty to disclose said risk to Gross prior to drilling the well, which he did not do. The court went on to find from the evidence that if Faulkner had disclosed the risk of bad water quality in the Knox, Miller would not have acted as he did in allowing the well to be drilled in the first place. The court then dismissed Faulkner's claim against Miller, Al Gross, and Endicott & Associates and entered judgment in favor of Miller on Miller's counterclaim for the liquidated damages sought, totaling $7,896. The court further allowed prejudgment interest on the amount at 8% per annum, as well as post-judgment interest at 12% per annum. Miller's claim for punitive damages was dismissed at trial on a motion for directed verdict. Faulkner now appeals the ruling in favor of Miller, and Miller cross-appeals the ruling on punitive damages.

Faulkner first argues that the trial court's finding that Faulkner failed to disclose the risk of unusable water to Gross should not bar Faulkner's claim of damages

for drilling the first two hundred (200) feet of the first well, the pump, equipment, installation, and drilling the last two shallow wells. Although the trial court did not specifically so state, the basis of its finding of liability was fraud in the inducement of the contract. Where one party to a contract knows that the other relies on him to disclose all facts material to execution thereof, the duty rests on him not to conceal anything material to the bargain, and one causing damage by concealment must assume the entire responsibility. *Davis v. Commissioners of Sewerage of City of Louisville*, 13 F.Supp. 672 (W.D.Ky.1936), *modified* 88 F.2d 797 (6th Cir.1937). Fraudulent concealment implies knowledge of the material fact concealed. *Fields v. Cornett*, 254 Ky. 35, 70 S.W.2d 954 (1934). As to what constitutes a material fact, the question is whether it is likely to affect the conduct of a reasonable man and be an inducement of the contract. *McHargue v. Fayette Coal & Feed Co.*, Ky., 283 S.W.2d 170 (1955).

■ Where the trial court acted as factfinder, its findings will not be reversed unless they are clearly erroneous. CR 52.01; *Alvey v. Union Inv., Inc.*, Ky.App., 697 S.W.2d 145 (1985). If supported by substantial evidence, the trial court's findings of fact are not clearly erroneous. *Black Motor Co. v. Greene*, Ky., 385 S.W.2d 954 (1964). In the instant case, we believe the trial court's findings as to concealment of a known material fact were supported by substantial evidence. Faulkner testified about prior wells he had drilled into the Knox which had yielded unusable water due to the levels of total dissolved solids therein. As to his duty to disclose this fact, Faulkner knew or at least should have known that Gross needed to be made aware of this fact before entering into the agreement to drill the well. There was no evidence that Gross knew of the risk of obtaining unusable water in the Knox prior to the well's being drilled. Regarding disclosure of the risk of bad water quality in the Knox, the evidence was conflicting and we must defer to the trial court's judgment. Finally, relative to the materiality of the concealment, Gross testified that he would definitely have advised Miller of the risk of getting usuable water as it would have affected their decision on whether or not to drill the well at all. Likewise, Miller testified that if he knew of the possibility of bad water quality, he would never have given Gross authority to drill the well and would have examined other water sources. Thus, since there was substantial evidence of concealment of a fact material to the initial contract to drill the well, Miller was entitled to rescission of the contract and Faulkner was properly not entitled to recover for drilling any part of the first well *or* any of the other costs associated with the contract.

■ Faulkner next argues that even if judgment in favor of Miller was proper, the allowance of prejudgment interest was in error. Prejudgment interest is awarded as a matter of course where damages are liquidated. *Nucor Corp. v. General Elec. Co.*, Ky., 812 S.W.2d 136 (1991). In order for damages to be deemed liquidated, there must be some certainty as to the amounts. *Id.* In reviewing the damages awarded to Miller, it is clear to us that these amounts were fixed and certain from the onset of litigation and we do not see that there was ever any dispute as to these sums. In fact, the largest of these sums ($6,636) was the amount actually billed by and paid to Faulkner.

■ The remaining issue before us is Miller's cross-appeal on the directed verdict dismissing Millers' claim for punitive damages. Faulkner argues, and the lower court agreed, that punitive damages were disallowed under KRS 411.184(4) since the claim stemmed from a breach of contract action. Miller argues that its counterclaim seeking punitive damages was not a breach of contract claim, but rather a separate claim for fraud in the inducement of the contract. Thus, KRS 411.184(4) would not preclude an award of punitive damages. We agree.

Although the statute (KRS 411.184(4)) and the case law are clear that punitive damages are not recoverable for mere breach of contract, *see Federal Kemper Ins. Co. v. Hornback*, Ky., 711 S.W.2d 844 (1986), *overruled in part by Curry v. Fireman's Fund Ins. Co.*, Ky., 784 S.W.2d 176 (1989), it has been held that if the breach included separately tortious conduct, punitive damages may be

awarded. *Wittmer v. Jones*, Ky., 864 S.W.2d 885 (1993); *Ford Motor Co. v. Mayes*, Ky. App., 575 S.W.2d 480 (1978). In the present case, Miller's counterclaim is not based on breach of contract. While Miller does assert fraud and misrepresentation in the inducement of the contract as a defense to Faulkner's breach of contract action, Miller's counterclaim contains a separate action for fraud and misrepresentation for which he seeks punitive damages. In *Hanson v. American National Bank & Trust Co.*, Ky., 865 S.W.2d 302 (1993), the Supreme Court affirmed a punitive damage award against a lender in an action alleging fraud in the inducement of a refinancing agreement. Accordingly, we reverse the court's ruling denying punitive damages as a matter of law and remand for the court to determine whether punitive damages were allowable under the facts as applied to KRS 411.184 and KRS 411.186 and, if so, the amount. We are not unmindful of the fact that an award of punitive damages is entirely within the discretion of the trial court as fact-finder in this case. *See Wittmer, supra.*

For the reasons stated above, the judgment of the Fayette Circuit Court is affirmed on appeal and reversed and remanded on cross-appeal for proceedings consistent with this opinion.

HUDDLESTON, J., concurs.

GUIDUGLI, J., dissents.