**J. Hilton BROOKS, III, M.D.,**
**Appellant/Cross–**
**Appellee,**

v.

**BROOKS FURNITURE MFGRS., INC.,**
**Appellee/Cross–Appellant.**

Nos. 2009–CA–000200–MR,
2009–CA–000280–MR.

Court of Appeals of Kentucky.

Oct. 29, 2010.

Philip E. Wilson (argued), Lexington, KY, for appellant/cross-appellee.

Ridley M. Sandidge, Jr. (argued), Louisville, KY, for appellee/cross-appellant.

## OPINION

THOMPSON, Judge:

J. Hilton Brooks, III, M.D., dissented from a November 30, 2004, merger of Brooks Furniture Mfgrs., Inc., a closely-held family corporation, into BFI Inc., a Tennessee corporation, and demanded payment for his shares. After the issue regarding Hilton's demand for payment remained unresolved, Brooks Furniture petitioned the Bell Circuit Court to determine the fair value of Hilton's shares plus accrued interest as provided in KRS 271B.13–300.

The issues presented concern: (1) the net asset book value of the corporation; (2) the application of a marketability discount and a minority shareholder discount to the valuation; (3) the interest due Hilton; (4) the failure to assess attorney's fees and expenses against Brooks Furniture; (5) the denial of discovery regarding post-merger stock ownership; and (6) the trial court's denial of Hilton's motion for summary judgment. The specificities presented by Hilton's appeal and Brooks Furniture's cross-appeal will be addressed individually.

## FACTUAL OVERVIEW

Brooks Furniture was formed in 1954 and, although in 1956 the corporation's operations were moved to Tennessee, it remained a Kentucky corporation. In 1964, Jerry Brooks, Hilton's father, purchased the 339 total outstanding shares and became the sole shareholder.

In the late 1970's, Jerry gifted shares of Brooks Furniture stock to members of his immediate family as follows: his son, Michael Brooks, 81.94 shares; Hilton, 35.70 shares; his daughter, Rebecca Nix, 32.25 shares; and his wife, Geraldine Brooks, 23 shares. Jerry retained 166.11 shares.

In 1986, primarily as the result of the sale of a glider rocker line, Brooks Furniture enjoyed financial success which continued until 1996, when profits began declining.

On October 21, 2004, when profits remained in decline, the board of directors voted to merge Brooks Furniture into a

new corporation, BFI, Inc. Under the planned merger, shareholders of Brooks Furniture would receive one share of BFI, Inc. in exchange for every eighty shares of Brooks Furniture stock. No fractional shares were to be issued. Consistent with a "squeeze-out" merger, any shareholders holding less than eighty shares of Brooks Furniture would receive a cash payment for their shares. As a result, Jerry and Michael would be the sole shareholders in the new corporation. Hilton, Rebecca, and Geraldine would receive cash for their shares.

On October 26, 2004, Hilton responded to the proposed merger with a notice of intent to demand payment as a dissenter pursuant to KRS 271B.13–210. The planned merger was approved on November 1, 2004. On December 10, 2004, Hilton demanded payment for his shares.

Based on an appraisal performed by Mercer Capital Management for gift planning purposes, at the time of the merger, the shares were valued at $10,600 per share. Although Hilton objected to the use of the valuation, on February 10, 2005, Brooks Furniture paid Hilton $378,420 based on $10,600 per share value. Interest on the amount was paid to Hilton at four percent in the amount of $3,027.31.

On March 9, 2005, Hilton demanded payment for his 35.70 shares in the amount of $1,364,009, or $38,207.53 per share, plus nine percent interest. In response, Brooks Furniture again requested a second appraisal from Mercer Capital.

Because Brooks Furniture had sixty days after receiving Hilton's demand for payment to file an action for judicial appraisal, the present complaint was filed by Brooks Furniture on May 5, 2005, prior to its receipt of the second Mercer Capital appraisal. KRS 271B.13–300(1). When the second appraisal was received, the price per share increased from $10,600 to $15,800 per share. Brooks Furniture immediately paid Hilton an additional $185,640, plus additional interest at the rate of four percent from November 30, 2004. Hilton continued to contest the accuracy of the appraisal.

Unable to reach an agreement with Hilton as to the value of Brooks Furniture, Brooks Furniture obtained a third appraisal from Lattimore, Black, Morgan and Cain (LBMC). Using an effective date of valuation as November 30, 2004, and the asset accumulation method, David Clinton Wood of LBMC determined the fair value. In doing so, he defined "fair value" as the "determination of the value of a going concern (i.e., the whole corporation) without the application of discounts or premiums typically applied to a specific security interest of the corporation being valued." The report specifically stated that no consideration was given for "discounts for lack of control and marketability" to the specific interest being valued. However, based on certain marketability factors, he discounted the adjusted net book value of assets by thirty percent.

Pursuant to the LBMC report, the value per share increased to $17,663.86 for a value of $630,600. Brooks Furniture immediately paid Hilton an additional $66,540 for his 35.70 shares, plus additional interest at four percent in the amount of $2,524.

Dissatisfied with the payment, Hilton retained Hooper Cornell, P.L.C. (HC) to prepare a valuation report of Brooks Furniture as of November 30, 2004. Keith Pinkerton of HC prepared the report and also used the asset accumulation method but valued Hilton's interest at $1,100,000 or $30,812.32 per share. He declined to discount the value and opined that any discounts would be inappropriate due to assets held by Brooks Furniture regardless of the method used for valuation.

With the case unresolved, the court held a bench trial after which it found the fair value of Hilton's shares to be $862,369, or $24,156 per share, and awarded five percent interest. Subsequently, the court heard evidence regarding Hilton's claims for attorney and expert witness fees and expenses, which it ultimately denied.

## STANDARD OF REVIEW APPLICABLE TO FINDINGS OF FACT

The issues presented by the appeal and cross-appeal regarding the valuation of Brooks Furniture's net assets and liabilities are factual. To avoid redundancy, we recite our standard of review applicable to the seven points in contention.

Our civil rules provide that findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." CR 52.01. Findings of fact are not clearly erroneous if those findings are supported by substantial evidence. *Faulkner Drilling Co. Inc. v. Gross,* 943 S.W.2d 634, 638 (Ky.App.1997). Substantial evidence is that which a "reasonable mind would accept as adequate to support a conclusion...." *Moore v. Asente,* 110 S.W.3d 336, 354 (Ky.2003). Although the evidence may be conflicting, this fact alone is insufficient to warrant a reversal of the trial court's findings. *Id.*

## BROOKS FURNITURE'S NET ASSET BOOK VALUE

The sole published case in this jurisdiction regarding the dissenters' rights statute is *Ford v. Courier—Journal Job Printing Co.,* 639 S.W.2d 553 (Ky.App. 1982). In *Ford,* after the minority shareholders voted against the sale of the closely-held corporation, the corporation filed an action requesting that the court determine the value of the dissenters' shares.

*Id.* at 554. Recognizing that the question of the definition of "fair value" was one of first impression in this jurisdiction, the court approved the interpretation as expressed by the Maine Supreme Court in *In re Valuation of Common Stock of Libby, McNeill & Libby,* 406 A.2d 54, 60 (Me.1979), and concluded:

That case states that the consensus among jurisdictions with statutes patterned after the Model Business Corporation Act, § 81, which Act was the basis of KRS 271A.405, is that three elements or approaches must be *considered,* and that the weight to be given to each element depends on the circumstances of each individual case. These elements are (1) the market value approach; (2) the earnings or investment approach; and (3) the net asset approach.

*Ford,* 639 S.W.2d at 555 (emphasis original).

The parties agree that the trial court properly used the net asset method of valuation. Their initial disagreement concerns the trial court's adjustments to the value of assets and liabilities of Brooks Furniture, which is attributable to six factors: (1) the book value of Brooks Furniture; (2) the value of furniture, fixtures, and equipment; (3) a suspended bonus payable to Jerry; (4) excessive compensation allegedly paid to Jerry and Michael; (5) Jerry's and Michael's deferred compensation; and (6) environmental remedial costs.

1. Hilton alleges that the trial court undervalued the reported book value by $76,881. He relies on the HC (Wood) valuation that was based on actual financial statements. The trial court relied on the LBMC (Pinkerton) valuation.

Because Brooks Furniture prepared bimonthly detailed financial statements, Wood averaged the October and December

2004 statements. When the numbers became available as of November 30, 2004, he revised the valuation and concluded that the statement of November 30, 2004, would produce a number of less than $4,000. Concluding that the amount was *de minimus* in the context of the pending litigation, he did not alter his original valuation.

Based on Wood's testimony, the trial court concluded that the actual book value impacted by the revised fair value estimate of Brooks Furniture was $4,000, not the $76,881 calculated by Pinkerton. Based on the evidence presented, we decline to usurp the discretion afforded the trial court.

■ 2. Hilton complains that the trial court erroneously accepted LBMC's valuation of furniture, fixtures and equipment. The evidence revealed those items had value in excess of the book value and other items were below book value. Pinkerton relied on the assessed values established by the Claiborne County, Tennessee, tax assessor. In contrast, Wood viewed the premises and the assessed items.

Wood testified that there was an abundance of equipment on the market and, further, that over seventy percent of the assets were purchased prior to 1992. He rejected the Tennessee personal property tax assessment valuation because it assessed all equipment as having a twenty percent salvage value regardless of age or condition. Based on the evidence, we cannot say that the trial court was clearly erroneous in accepting the valuation offered by Wood.

■ 3. Hilton contends that a balance of $412,500 payable as a bonus to Jerry was erroneously included as a liability of the corporation. The trial court premised its findings on the factors precipitating the bonus.

In 1993, Brooks Furniture declared a bonus in the amount of $1,500,000 payable to Jerry in recognition of Jerry's service to the corporation and to compensate him for years when he received no salary and/or a reduced salary. In 2000, when the corporation incurred significant losses, its Board of Directors suspended the bonus, leaving an unpaid balance of $412,500. The trial court agreed with the LBMC report which listed the bonus as a non-current liability and found that it represented compensation earned by Jerry, and owed to him by Brooks Furniture. Although the evidence could support the prevailing of a different finding, we cannot say the trial court's finding was clearly erroneous.

4. Hilton alleges that Jerry and Michael were paid excessive salaries between 1993 and November 30, 2004, which reduced the net asset book value of Brooks Furniture by $4,650,477.[1] The trial court rejected his contention.

It noted that the salaries were the result of high corporate earnings under the direction of Jerry and Michael and that the corporation was a closely-held family business in which it is common for the officers responsible to gain from its prosperity. Again, we cannot say that the trial court's finding was clearly erroneous.

■ 5. Brooks Furniture maintains that the trial court erred when it rejected its assertion that an environmental remediation expense was a valid liability in calculating its net asset value.

Between 1993 and 1995, Brooks Furniture's plant site was contaminated after a petroleum product leaked onto its property from neighboring Tazewell Oil Corporation, Inc. Brooks Furniture pursued

1. This amount included interest at 9% from 1993 until the date of trial.

Tazewell for compensation but its efforts failed because of Tazewell's insolvency. Subsequently, the State of Tennessee filed a contamination notice in the local real estate records and posted the property as contaminated.

On March 8, 2005, Brooks Furniture obtained an environmental remediation estimate in the amount of $201,000, which Wood recognized as a corporate liability and reduced the net asset value of the corporation accordingly. However, Brooks Furniture was not under a mandate to clean up the spill and could elect to do nothing and allow the contamination to dissipate. We agree with the trial court that the claim was too contingent or speculative to be included on the adjusted balance sheet for valuation purposes.

■ 6. Brooks Furniture also argues that the trial court erred when it rejected the part of the LBMC valuation that included portions of Michael's and Jerry's salaries as a liability. Due to the continued poor performance of the corporation, Jerry's and Michael's salaries were reduced which LBMC listed as an $899,435 non-current liability.

The minutes from Brooks Furniture's March 26, 2000, Board of Directors' meeting reflect that although the salary reductions were classified as deferred, the minutes further state that the deferral would continue until the Board determined they could be paid. Thus, the trial court found that the salaries were unilaterally reduced by the corporation and that there was no basis upon which Jerry or Michael could assert a right of entitlement for those amounts. Therefore, it refused to include the salaries as a liability.

We agree. By virtue of the merger, with no action taken by Brooks Furniture's Board of Directors to pay the suspended amounts, any potential liability was extinguished.

## THE REDUCTION OF BROOKS FURNITURE'S ADJUSTED NET BOOK VALUE OF ASSETS APPLICATION OF A MARKETABILITY DISCOUNT

The most complex issue is whether the trial court properly applied a twenty percent discount to the adjusted net book value of the corporation's assets. The discount was premised on the LBMC appraisal and the trial court's ultimate conclusion that Brooks Furniture's shares were valued at less than the adjusted net book value of assets because it was a high risk investment and the time and expense required to find a potential buyer.

■ The LBMC appraisal discounted the value of the corporation based on the assumed factors a willing buyer and willing seller would consider to negotiate a fair market value price including: (1) working capital required; (2) alternative investments and risks associated with the purchase; (3) potential shutdown costs or physical relocation; (4) cost associated with liquidation; and (5) that a sale would take twelve to twenty-four months to finalize. Thus, the issue presented is whether the concept of a discount attributable to the marketability of the corporation's shares is appropriate in a squeeze-out merger of a closely-held corporation. Consistent with the modern view, we hold that a marketability discount should not be applied in determining the fair value of a dissenter's shares unless exceptional circumstances exist.

Every state now has a form of a dissenters' rights statute pursuant to which a shareholder opposed to corporate change may provide a notice of dissent and force the corporation to purchase his shares at a judicially determined price. *See Pueblo Bancorporation v. Lindoe, Inc.,* 63 P.3d

353, 358 (Colo.2003). Although the terminology differs, one commentator explained the purpose of the statute is uniform:

Minority shareholders are granted limited statutory rights as a check against rampant majority rule. One such right is the ability of shareholders to dissent from certain corporate actions, primarily mergers and other fundamental corporate changes and to receive the appraised fair value of their shares. This is sometimes known as the dissent and appraisal remedy, dissenters' rights, or simply, the appraisal remedy....

Most of the current appraisal litigation involves cash-out mergers, often instituted by a controlling shareholder. The appraisal remedy today serves a minority shareholder protection role, providing liquidity to shareholders, but most often operating to protect minority shareholders who are cashed out of their investment. The remedy fulfills this function *ex ante,* deterring insiders from engaging in wrongful transactions, and *ex post,* providing a remedy to minority shareholders who are subjected to such transactions.

Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value,* 47 Duke L.J. 613, 613–16 (1998) (footnotes omitted).

Frequently debated is what, if any, discount should be applied to determine the fair value of the dissenters' shares, including a minority shareholder discount and marketability discount. "A minority discount adjusts for lack of control over the business entity on the theory that non-controlling shares of stock are not worth their proportionate share of the firm's value because they lack voting power." *See Lawson Mardon Wheaton, Inc. v. Smith,* 160 N.J. 383, 398–99, 734 A.2d 738, 747 (1999). A marketability discount encompasses factors that adjust for a lack of liquidity of a closely-held corporation on the theory that the potential pool of buyers is limited. *Id.* In the present case, the parties agree that a minority discount was not applied; however, it is clear that the trial court applied a marketability discount. Therefore, we must determine whether a marketability discount is allowed under our dissenters' rights statute. Because the issue is one of law, our standard of review is *de novo. Western Kentucky Coca–Cola Bottling Co., Inc. v. Revenue Cabinet,* 80 S.W.3d 787 (Ky.App.2001).

The Kentucky dissenters' rights statute was first enacted in 1972 as a part of the adoption of the Model Business Corporation Act of 1969. 1972 Ky. Acts, ch. 274, §§ 80–81. These sections, codified at KRS 271A.400 and 271A.405, entitled a dissenting shareholder to receive "fair value" for his or her shares. KRS Chapter 271A as enacted did not contain a definition of "fair value." In 1988, the legislature repealed KRS Chapter 271A, 1988 Ky. Acts, ch. 23, § 248, and in its stead, adopted the then current version of the Model Business Corporation Act as KRS Chapter 271B. 1988 Ky. Acts, ch. 23, §§ 1–194.

KRS Chapter 271B, Subtitle 13, contains the provisions governing dissenters' rights, and a definition of "fair value" is set forth in KRS 271B.13–010. It states that "fair value" is the "value of shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action, unless exclusion would be inequitable." KRS 271B.13–010(3). The statute is silent regarding minority or marketability discounts and has not been amended to reflect the 1999 revised MBCA, which now states that the value of the corporation's shares is determined without discounting for lack of marketability or minority status. Model Bus. Corp. Act 3d § 13.02(5).

Our Supreme Court has not had the opportunity to address the meaning of the term "fair value" as broadly defined in the statute, leaving *Ford* as the only published decision in the Commonwealth pertaining to the issue.

In *Ford*, this Court held applying a marketability discount to the net asset value of a closely-held corporation was within the trial court's discretion. We stated:

> The 25 per cent reduction in net asset value based on marketability was not an arbitrary or clearly erroneous figure. The appraisers noted in their report that in sales of some eight publicly held corporations there was an average of 24.2 per cent in discount from net asset value in similar sales.
>
> Nor do we feel that the discount here was applied merely because of the minority position of the appellants. The report indicates that the "minority interest" would be a consideration in discarding the "earning related approach" as unsound, but that the discount applied to the net asset approach was an "over-all" or a "marketability discount," not a "minority" discount.

*Ford,* 639 S.W.2d at 556–57.

■ After a perusal of the law and commentary, we conclude that the approval of a marketability discount except under extraordinary circumstances is inconsistent with the majority rule that such discounts are impermissible in the context of a squeeze-out merger and, to the extent that *Ford* holds otherwise, it is overruled.

We begin with the basic premise that our goal when interpreting a statute is to discern the legislative intent. When a statute is unambiguous, we must construe the language according to its common usage. However, if the language is ambiguous, we may consider alternative factors to ascertain its intent including the statute's purpose, the circumstances leading to its adoption and the consequences of a particular construction. *See King Drugs, Inc. v. Commonwealth,* 250 S.W.3d 643 (Ky.2008).

There is a plethora of judicial decisions regarding the meaning of "fair value" and, consequently, the application of a marketability discount; however, there is no consensus. A detailed summary of the law on the subject was given in *Pueblo Bancorporation* wherein the Court noted that the majority of states have dissenters' rights statutes which require that a dissenting shareholder be paid "fair value" for his shares. *Pueblo Bancorporation,* 63 P.3d. at 364–65.[2] The Court's research further revealed that there is a modern trend against applying marketability discounts in determining fair value among the jurisdictions with "fair value" statutes. *Id.* at 366. Only six states, including Kentucky, are cited as having approved marketability discounts. *Id.* at 367.

The American Law Institute (A.L.I.) has recognized the national trend of interpreting fair value as the proportionate share of a going concern "without any discount for minority status or, absent extraordinary circumstances, lack of marketability." A.L.I., *Principles of Corporate Governance: Analysis and Recommendation,* § 7.22(a) (1994). The comments further provide that the trial court must determine

---

**2.** The Court cited the five cases that use a different term: (1) California, Cal. Corp.Code § 1300 (West 1990 & Supp.2003) ("fair market value"); (2) Kansas, Kan. Stat. Ann. § 17–6712 (1995 & Supp.2001) ("value"); (3) Louisiana, La.Rev.Stat. Ann. § 12:131(C)(2) (West 1994 & Supp.2002) ("fair cash value"); (4) Ohio, Ohio Rev.Code Ann. § 1701.85(C) (Anderson 2001) ("fair cash value"); and (5) Wisconsin, Wis. Stat. Ann. §§ 180.1301, 180.1130(9)(a) ("market value" for business combinations and "fair value" for other fundamental changes). *Id.* at 365, n. 11.

the aggregate value of the firm as an entity, and then allocate that value *pro rata* in accordance with the shareholders' percentage of ownership. A.L.I. § 7.22 cmt. d.

In addition to the cases and commentary cited that disapprove of discounts, as this Court did in *Ford,* we turn to the State of Maine for guidance, specifically the Supreme Court's decision in *In re Valuation of Common Stock of McLoon Oil Co.,* 565 A.2d 997 (Me.1989), where the Court clarified its holding in *In re Valuation of Common Stock of Libby, McNeill & Libby.* In *Ford,* our Supreme Court relied heavily on *Libby,* thus, the Maine Court's subsequent decision is of particular relevance to our discussion.

The Maine Court was presented with a concise issue: After the completion of the valuation of the entire firm by the best available methods, should a dissenting shareholders' proportionate share be discounted because of minority status and lack of marketability of his stock? Following the lead of the Delaware Supreme Court in *Cavalier Oil Corp. v. Harnett,* 564 A.2d 1137 (Del.1989), and recognizing that the minority shareholders' sale is an involuntary one, the Maine Court explained that the willing buyer/willing seller approach to determine stock listed on the New York Stock Exchange in the appraisal process is nebulous in a closely-held corporation. It explained:

Lido (appellant) would have us discount the stock for minority status and lack of marketability in order to reflect what it calls the "real world" value of the stock to the Dissenters. Lido bases its argument upon a plain misreading of our analysis in *Libby.* We there in a footnote approved the "willing buyer/willing seller" approach used by the court-appointed appraiser in *Libby* "so far as it goes" to determine stock *market* price;

we did not, however, equate the price at which a willing seller would sell and a willing buyer would buy a minority block of stock with its fair value under the appraisal statute. *See Libby,* 406 A.2d at 61 n. 8. The willing seller/willing buyer price is indicative only of stock market price, and that is only one of the three factors used in the *Libby* analysis of the fair value of stock listed on the New York Stock Exchange. Especially in fixing the appraisal remedy in a close corporation, the relevant inquiry is what is the highest price a single buyer would reasonably pay for the whole enterprise, not what a willing buyer and a willing seller would bargain out as the sales price of a dissenting shareholder's shares in a hypothetical market transaction. Any rule of law that gave the shareholders less than their proportionate share of the whole firm's fair value would produce a transfer of wealth from the minority shareholders to the shareholders in control. Such a rule would inevitably encourage corporate squeeze-outs.

*In re Valuation of Common Stock of McLoon Oil Co.,* 565 A.2d at 1004–05. (internal quotations, citations and footnotes omitted).

Since *Cavalier* and *McLoon,* courts that have considered the issue of marketability discounts have generally followed the Delaware and Maine courts' lead and those with "fair value" statutes have held that a marketability discount should not be applied in determining fair value. *See e.g., Offenbecher v. Baron Services, Inc.,* 874 So.2d 532 (Ala.Civ.App.2002); *Blitch v. Peoples Bank,* 246 Ga.App. 453, 540 S.E.2d 667 (2000); *Advanced Communication Design, Inc. v. Follett,* 615 N.W.2d 285 (Minn. 2000); *Swope v. Siegel–Robert, Inc.,* 243 F.3d 486 (8th Cir.2001); *Rigel Corp. v. Cutchall,* 245 Neb. 118, 511 N.W.2d 519

(1994); *Woolf v. Universal Fidelity Life Ins. Co.*, 849 P.2d 1093 (Okla.App.1992) (expressing approval of the Delaware position of prohibiting all discounts at the shareholder level); *Charland v. Country View Golf Club, Inc.*, 588 A.2d 609 (R.I. 1991) (interpreting the "fair value" standard of statute authorizing a buyout of a minority shareholder who has petitioned for corporate dissolution); *Morrow v. Martschink*, 922 F.Supp. 1093 (D.S.C.1995) (same); *First Western Bank Wall v. Olsen*, 621 N.W.2d 611 (S.D.2001); *Hogle v. Zinetics Medical, Inc.*, 2002 UT 121, 63 P.3d 80 (2002); *Matthew G. Norton Co. v. Smyth*, 112 Wash.App. 865, 51 P.3d 159 (2002).

Consistent with that expressed in *Cavalier Oil Corp.*, courts have reasoned that to do otherwise would permit a windfall to the majority shareholders from the appraisal process by cashing out a dissenting shareholder, a result entirely inconsistent with the dissenters' rights statute. *See Cavalier Oil Corp.*, 564 A.2d at 1145.

We agree with the logic expressed and conclude that it is particularly true in the case of a closely-held family corporation. Although not traded on the open market, by virtue of KRS 271B.13–300(1), a statutorily mandated market is created for a dissenting shareholders' stock. Thus, an adjustment for a hypothetical willing buyer and willing seller is inappropriate and contrary to the statute's purpose that the dissenter receive the full value of his proportionate interest in the corporation as a going concern. However, rather than establishing a bright-line rule as expressed in the MBCA, we believe the view that equity will permit the discount in exceptional circumstances, as expressed by the A.L.I., is the better view. The exception recognized is an equitable one and is applied only when the trial court "finds that the dissenting shareholder has held out in order to exploit the transaction giving rise to the appraisal so as to divert value to itself that could not be made proportionately to other shareholders." A.L.I. § 7.22 cmt. e.

In the present case, there are no facts to justify a deviation from the rule prohibiting a marketability discount in a dissenters' rights action in a closely-held corporation. The facts of this case give the appearance of an attempted squeeze-out merger with the goal of forming a new corporation and excluding Hilton from ownership.

We conclude that the marketability discount applied in this case made it possible for Brooks Furniture's majority shareholders to squeeze-out Hilton at a price considerably less than his proportionate interest in the corporation as whole. Although the LBMC appraisal purported to apply the discount to all the corporate stock, it nevertheless diminished the value of Hilton's shares based on the fiction of the corporation's marketability on the open market. The result was the majority shareholders accomplished their goal of squeezing-out Hilton and emerging as the owners of a new corporation. We agree with the Alabama Court when it disavowed such discounts as a means to indirectly accomplish what could not otherwise be done directly.

"While ... [a marketability] discount can claim more theoretical support than the minority discount, and ostensibly could apply to all shares, majority as well as minority, there is the likelihood for this to be a refuge for practitioners and courts that do not recognize the changed role of appraisal." 1 F. Hodge O'Neal & Robert B. Thompson, *O'Neal's Oppression of Minority Shareholders*, § 5.32 (2d ed.1999). In crediting Saliba's testimony regarding the appropriateness of a 50 percent marketability discount, the trial court not only failed

to recognize the role of the modern appraisal remedy, it made possible in this case precisely the sort of squeeze-out oppression that the appraisal remedy based on "fair value" was designed to prevent.

*Offenbecher,* 874 So.2d at 539.

## THE AWARD OF FIVE PERCENT INTEREST

■ KRS 271B.13–300 provides that a prevailing dissenter is entitled to interest on a judgment. KRS 271B.13–010(4) defines "interest" as the average rate currently paid by the corporation on its principal bank loans or, if none, at a fair and equitable rate under the circumstances. Because Brooks Furniture had no outstanding bank loans on November 30, 2004, the court was required to make findings of fact regarding the fair and equitable rate to be paid. Thus, we must affirm if the award of five percent interest was based on substantial evidence.

The Court disagreed with Hilton that the rate should have been nine percent based on a 1997 promissory note payable to the corporation by Jerry Brooks. The Court found that the amount was not a substantial liability and instead established interest at the prevailing prime rate on that date of the corporate action. Under the circumstances, the court did not err in setting an interest rate based on that at which Brooks Furniture could have obtained a bank loan. We conclude that the trial court did not abuse its discretion.

## THE FAILURE TO ASSESS ATTORNEY'S FEES, EXPERT FEES AND EXPENSES

■ KRS 271B.13–310(2) permits the recovery of attorney's fees and expert costs and expenses in two situations: (a) against the corporation if the court finds that the corporation did not substantially comply with the dissenters' rights statutes; and (b) if the court finds that the party against whom fees and costs are assessed acted arbitrarily, vexatiously or not in good faith with respect to the rights provided in the dissenters' rights cases. The award is within the trial court's discretion. *See Matter of Shore,* 67 A.D.2d 526, 415 N.Y.S.2d 878 (1979).

Hilton contends that the initial offer by Brooks Furniture and its reliance on the Mercer Capital appraisal was in such a low amount that the trial court was required to find that it did not constitute substantial compliance with the requirement in KRS 271B.13–250 that the corporation pay the dissenter the estimated fair value of the dissenter's shares.

■ Kentucky's statute does not require the payment of fees and expenses merely because the fair value of the shares materially exceeds that which the corporation offered to pay. *Shore,* 67 A.D.2d 526, 415 N.Y.S.2d 878 (New York's statute permits an award of fees and expenses under such circumstances). The trial court found that Brooks Furniture had complied with statutory notice requirements, that Brooks Furniture's reliance on the Mercer Capital appraisal substantially complied with the offer of a fair value for Hilton's shares, and there was no evidence that Brooks Furniture's offer was made in bad faith. We cannot say that the trial court abused its discretion.

## THE TRIAL COURT'S DENIAL OF DISCOVERY REGARDING THE NUMBER OF SHARES OWNED BY JERRY AND MICHAEL BROOKS AT THE TIME OF THE MERGER

■ Hilton served written discovery requesting details and documents regarding a gift of stock from Jerry to Michael in 2004, after the date of the merger vote.

The standard of review in matters involving discovery is whether the trial court abused its discretion. *Manus, Inc. v. Terry Maxedon Hauling, Inc.*, 191 S.W.3d 4, 8 (Ky.App.2006).

■ Hilton contended that any gift of stock from Jerry to Michael was relevant to his claim for fees and expenses. We agree with the trial court that the question of post-merger stock ownership was a collateral issue and irrelevant to the question of Hilton's claim for fees and expenses.

## THE DENIAL OF HILTON'S MOTION FOR SUMMARY JUDGEMENT

On appeal, Hilton merely refers this Court to the record and his request that the complaint be dismissed. We have reviewed the record and find no merit in Hilton's claim.

## CONCLUSION

We now adopt the view expressed by the jurisdictions that hold marketability discounts are not applied in a dissenters' rights action involving a closely held corporation absent exceptional circumstances. To the extent that *Ford* is inconsistent with our holding, it is overruled.

Based on the foregoing, we reverse the Bell Circuit Court's application of twenty percent marketability discount and consistent with our opinion, remand the case for an award of the fair value of Hilton's shares. In all other respects, the judgment is affirmed.

TAYLOR, Chief Judge; CAPERTON, CLAYTON, DIXON, MOORE, NICKELL, and STUMBO, Judges, Concur.

ACREE, Judge, Concurs and Files Separate Opinion.

WINE, Judge, Concurs in Part and Dissents in Part, and Files Separate Opinion.

VANMETER, Judge, Dissents by Separate Opinion in Which Combs, Keller, and LAMBERT, Judges, Join.

ACREE, Judge, Concurring:

I concur in the majority opinion but write separately, and respectfully, to address the dissent.

The dissent finds application of a marketability discount acceptable if it is applied at the corporate or enterprise level rather than at the shareholder level. This is consistent with the corporation's position that relies largely on *Cavalier Oil Corporation v. Harnett*, 564 A.2d 1137, 1144–45 (Del.1989). *But see Offenbecher v. Baron Services, Inc.*, 874 So.2d 532, 538 (Ala.Civ. App.2002) (*"Cavalier Oil Corp. v. Harnett,* 564 A.2d 1137 (Del.1989), did not hold that corporate-level discounting of minority shares (such as that undertaken by the trial court in this case) was permissible."). For the reasons stated below, I disagree with the dissent's view as it would be applied generally, and most particularly in this case.

The 8th Circuit Court of Appeals concisely stated my position: "Because 'fair market value' is irrelevant to the determination of fair value, market forces, such as the availability of buyers for the stock, do not affect the ultimate assessment of fair value in an appraisal proceeding." *Swope v. Siegel–Robert, Inc.*, 243 F.3d 486, 493 (8th Cir.2001). Why is "fair market value" irrelevant in a dissenter's rights valuation? Because the goal under dissenters' rights statutes is not to determine how a third-party purchaser might value the company—by definition that *would* be its fair market value. Instead, the goal is to determine the "fair value" of the company to those who currently own it—that is, the

intrinsic value of the stock held by the dissenters who do not want to part with it but are compelled to do so, and the intrinsic value of that same stock to the majority shareholders who approved the merger and desire the dissenters' stock for the corporation or for themselves.

In this case, as with any family-owned, closely-held corporation, there is no market for these shares. I see no justification for polluting a "fair value" appraisal under any circumstances, but particularly where no market exists, by incorporating in the analysis an antithetical factor—"fair market value"—which we define as "the price that a willing seller will take and a willing buyer will pay for property, neither being under any compulsion to sell or buy and both being in possession of all relevant information regarding the property." *Wilhite v. Rockwell Int'l Corp.*, 83 S.W.3d 516, 519 n. 6 (Ky.2002) (citations omitted). The dynamics of an arm's-length transaction are not at play in a dissenter's rights appraisal.

Once the stock's value to third parties is introduced as a factor in a dissenters' rights valuation, as it was in this case, other factors are effectively trumped and the valuation is no longer the stock's "fair value" but its "fair market value." Appropriately in my opinion, and consistent with the approach taken by the American Law Institute, the role of any "fair market value" consideration has been marginalized in a dissenter's rights stock appraisal. *See, e.g., Casey v. Brennan*, 344 N.J.Super. 83, 780 A.2d 553, 570 (2001)("Fair market value is only a potentially 'valuable corroborative tool.' ").[3]

The purpose underlying dissenters' rights statutes is to fairly compensate minority shareholders for the loss of veto power when the majority shareholders vote to take corporate action contrary to the minority shareholders' wishes. *See, e.g., Pueblo Bancorporation v. Lindoe, Inc.*, 63 P.3d 353, 358 (Colo.2003) (citing A.L.I., *Principles of Corporate Governance: Analysis and Recommendations*, Ch. 4 introductory note (1994)). "Fair market value" has little or nothing to do with determining the "fair value" of that veto power. In closely-held corporations in which there is no ready market for the shares (which typically carry restrictions on alienation), and consequently for which there is no fair market value, a "fair value" determination that is free of bargain-driven market influences is particularly appropriate. As noted by one commentator,

> Close corporations by their nature have less value to outsiders, but at the same time their value may be even greater to other shareholders who want to keep the business in the form of a close corporation. Discounts would call

---

**3.** The concept of "fair market value" as a "corroborative tool" can be traced to what one commentator identifies as the very first case in the country to apply a "fair value" analysis, or as it is also called, an "intrinsic value" analysis—*Dermody v. Sticco*, 191 N.J.Super. 192, 465 A.2d 948 (1983). *See* Nelson Ferebee Taylor, *Evolution Of Corporate Combination Law: Policy Issues And Constitutional Questions*, 76 N.C. L. REV. 687, 848 fn.692 (1998). *Dermody*, notably decided a year after *Ford v. Courier–Journal*, states that "[w]hile [the corporation's] *payment above market price* does not automatically translate into fairness, it does represent a

factor in valuation which properly may be taken into account *when a stock is publicly traded as in the present case." Dermody*, 465 A.2d at 951 (emphasis supplied). The "factor" referred to here is the "payment above market price" and not the market price itself. Presuming a market exists with which to compare the price offered for the dissenters' stock, a payment below market price would be suspect. That is an example of the corroborative role of fair market value in these cases. Because Brooks Furniture Mfgrs. is not publicly traded and there is no market for the stock, fair market value cannot even be used as a corroborative tool.

for speculation by a court as to whether a market exists by requiring the judge to determine a value, deduct a variable percentage, decide how unmarketable a stock is, and so forth, which is clearly an undesirable result.

Bobbie J. Hollis, II, *The Unfairness of Applying Lack of Marketability Discounts to Determine Fair Value in Dissenter's Rights Cases*, 25 J. CORP. L. 137, 141 (1999) (footnotes omitted).

Furthermore, Brooks Furniture Mfgrs. is not only a closely-held corporation; it is family-owned. Marketability discounts have been viewed as especially inapplicable to intra-family transfers in closely-held companies, as in this case. Harry J. Haynsworth, *Valuation of Business Interests*, 33 MERCER L.REV. 457, 489 n.92 (1982); *see also Lawson Mardon Wheaton, Inc. v. Smith*, 160 N.J. 383, 734 A.2d 738, 745 (N.J.1999)("Case law and commentators reject application of the marketability discount when shares are acquired by the corporation . . . and marketability discounts have been viewed as especially inapplicable to intra-family transfers in closely-held companies[.]" (citations, quotations and brackets omitted)). "In family businesses, the members do not want outsiders to have ownership interests. Thus, the lack of marketability can actually enhance the value of the stock." Haynsworth, *supra*, at 489 n. 92.

The dissent and the corporation posit that the ill effects of a "fair market value" factor are mooted by applying the marketability discount at the corporate level. The dissent cites *In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d

997 (Me.1989) for this point. I read *McLoon* differently.[4] The corporation in *McLoon*, like the corporation in the case before us, was a closely-held, family-owned corporation. Like the corporate shares in the case *sub judice*, there was no market for shares of McLoon Oil Co. So, the appraisers imagined one. *McLoon* rejected the concept of an imaginary market.

In the absence of any trading history on any market, [the] attempt to construct a hypothetical market for this stock is a particularly useless—and dangerously misleading—exercise. In the situation in which the stock in question has never been traded on a market, courts and commentators alike have rejected construction of a market as too speculative to be helpful in the appraisal process.

*McLoon* at 1005 fn. 8 (citations omitted). After specifically rejecting the idea of a "hypothetical market transaction" for unmarketed stock, the Maine court agreed with the lower court's finding "that market price has no reliability in the calculus of fair value in this case and accorded no weight to *any* market price factor." *Id.* at 1005 (emphasis supplied). As the court also states, "no separate discounting *per se* of the *whole fair value* would be in order." *Id.* at 1005 fn. 8 (emphasis supplied; citing *Ford v. Courier–Journal*). I read these statements as indicating there should be no lack of marketability discounting at any level.

Admittedly, *McLoon* would be clearer had the court resisted the urge to utilize traditional third-party sale concepts to describe its holding. However, rendered as

---

4. I am not alone in my reading of *McLoon*. A three-judge panel of this Court recently "adopt[ed] the reasoning of *McLoon* as it pertains to *closely held corporations* " when it reversed and remanded a dissenters' rights case instructing the court to value the minority shareholder's stock "giving no weight to the fair market considerations of the net asset approach or the 25% marketability discount." *Shawnee Telecom Resources, Inc. v. Brown*, No. 2008–CA–000042–MR, 2009 WL 2475269, at *3 (Ky.App., Aug. 14, 2009) (emphasis in original).

it was before the more evolved "fair value" analyses of the Delaware and New Jersey courts and those of numerous commentators, it is not surprising the court turned to a ten-year-old case for concepts with which it was familiar—the " 'willing buyer/willing seller' approach used by the court-appointed appraiser in *Libby* [*In re Valuation of Common Stock of Libby, McNeill & Libby*, 406 A.2d 54 (Me.1979) ] 'so far as it goes[.]' " *McLoon* at 1004–05. *McLoon*'s analysis was a product of its time.

Today, because it alludes to what a single buyer would pay for the corporation while simultaneously rejecting marketability discounts, *McLoon* seems incongruous. On the one hand, Maine is not counted among those states that "clearly concluded that fair value may include marketability discounts." *Pueblo Bancorporation v. Lindoe, Inc.*, 63 P.3d 353, 367 (Colo.2003). On the other hand, a federal judge recently stated that, "[a]s required by Maine law, *McLoon*, 565 A.2d at 1003, I also must account for a marketability discount in my analysis[.]" *Kaplan v. First Hartford Corp.*, 603 F.Supp.2d 195, 198 fn. 9 (D.Me. 2009). Few Maine state court decisions cite *McLoon*, and those that do make no reference to marketability discounts, so we cannot find reconciliation of the incongruity there. We are left then with *Kaplan*.[5]

The court in *Kaplan*, like the dissent, focused on the same "single buyer" language in *McLoon*, but applied marketability concepts in a way that radically differs from that suggested by the dissent. The dissent suggests adjusting *downward* the net asset valuation of non-publicly-traded shares; *Kaplan* adjusted *upward* the market-based valuation of publicly-traded shares to arrive at "fair value."[6] *Kaplan* at 210. In *Kaplan*, the appraisers utilized a "market-based analysis [and] valued the business at $10 million, based upon minority interest stock transfers[, but the appraisal] did not correct for any minority or marketability discount." *Kaplan* at 201. Applying *McLoon*, the court said:

> Taking into account the market value reflected in [the minority interest stock transfers] and *adjusting upward* for an implicit marketability and minority discount, I conclude that the fair value of First Hartford's entire business on September 15, 2005, was $15 million.

*Kaplan* at 210 (emphasis supplied). If the circuit court in our case had utilized a market-based approach, which it appropriately did not, and had followed *McLoon/Kaplan*, the result would have been an *upward adjustment* to account for the artificial devaluing of the company's worth attributable to its lack of marketability.

*McLoon/Kaplan* reinforces my conviction that once the entire corporation has been valued as a going concern by applying an appraisal methodology that passes judicial muster, as here, then discounting for any reason taints the analysis and deprives the dissenters of the fair value of their stock, whether the discount is applied at the enterprise level or the shareholder level. The case *sub judice* illustrates why, subsequent to the determination of adjusted net asset value, no downward adjustment for "fair market

---

**5.** And, of course, *Shawnee Telecom Resources, Inc. v. Brown*, at footnote 2, *supra*.

**6.** Although the corporation in *Kaplan* was publicly traded, the court noted "it is traded only thinly on the Pink Sheets [a financial service that reports information about over-the-counter securities trading and issuers], and in some respects it behaves much like a closely held corporation." *Kaplan* at 197, 197 fn. 3. In fact, one of the appraisers treated the corporation as though it were a closely-held corporation. *Id.* at 197 fn. 4.

value" is appropriate. The illustration begins with the valuation method selected.

The parties agreed that the corporation "should be valued as a going concern and on a controlling interest basis." (Judicial Appraisal of Dissenters' Shares, p. 4). The parties further agreed and the circuit court determined that "the asset accumulation method of valuation is the most appropriate method of valuation in this case." (Judicial Appraisal, p. 5). In fact, the circuit court said "the only reliable valuation method in this case is the Asset Accumulation Method[,]" also known as the "adjusted net asset value" or "adjusted net book value" method. (Judicial Appraisal, pp. 11, 10). The income approach was rejected as "unreliable because of BFM's lack of profitability in the years preceding the valuation, and the market approach was found deficient because of lack of comparability." (Judicial Appraisal, p. 5). By rejecting these approaches, the circuit court, at least in part, already accounted for what the dissent refers to as "exceptional circumstances" justifying a discount for lack of marketability, *i.e.*, "that buyers of money-losing businesses are hard to find and those who can be found might want to discount the value of the assets to account for the risk."[7] Once the adjusted net asset valuation method was applied, and the factual disputes regarding assets and liabilities were resolved, determination of "fair value" was achieved. But the court's appraisal did not stop there.

The circuit court considered the corporation's proposal to apply a 30% downward adjustment to the adjusted net asset value based on what the corporation's appraiser called "BFM's classification as a high risk investment and the length of time neces-

sary to recruit a potential buyer and complete a sale of the company." (Judicial Appraisal, p. 10). In the circuit court's words, this 30% adjustment would have resulted "in a fair value of BFM using the Asset Accumulation Method of $6,394,847. The Court notes that this figure is *less than the total of BFM's cash reserves.*" Judicial Appraisal, p. 9; emphasis supplied. In other words, the corporation's adjustment for lack of marketability would have discounted all non-cash assets to a value of $0 and valued its cash reserves at less than 100 cents on the dollar. The circuit court, in my opinion, should have rejected this marketability discount outright and in its entirety as absurd, but it did not.

Instead, guided by *Ford v. Courier-Journal,* 639 S.W.2d 553 (1982), the circuit court considered whether any marketability discount at all should apply. Judicial Appraisal, p. 4. The court answered that question in the affirmative.

The Court would agree that an adjustment or marketability discount is appropriate in BFM's case but not a discount or adjustment of 30%. While it is true that BFM was struggling on the date of valuation, BFM had cash reserves available to weather many storms [and the] leadership and business savvy in the person of Jerry Brooks, who has proven on more than one occasion that a way can be found to make BFM profitable. The Court believes these factors are important in determining the appropriate adjustment or discount.

Judicial Appraisal, p. 10. Apparently using the proposed 30% discount as a starting point and then accounting for these positive business factors, the circuit court

---

7. To clarify, I do not believe the inapplicability of the marketability discount is dependent upon the valuation method utilized, but that it is equally inapplicable regardless of the method.

reduced the corporation's proposed discount from 30% to 20%, stating,

> The Court's Adjusted Net Book Value of Assets in the amount of $10,235,931.00 shall be adjusted by 20%. The Court finds the fair value of BFM using the Asset Accumulation Method to be $8,188,745.00.

Id. Relative to the absurd "fair value" determination urged by the corporation (a valuation of less than the corporation's cash reserves), this determination of "fair value" is somewhat more reasonable, but only slightly so. As demonstrated below, when the 20% discount is applied to discountable assets, the circuit court's determination of "fair value" is still artificially and unreasonably low.

Of the total adjusted net book value of assets ($10,235,931), at least $6,394,847[8] was cash reserves according to the circuit court; therefore, non-cash assets had an adjusted net value of $3,841,084. Since, as the circuit court implied, it is simply wrong-headed to discount the value of cash reserves, we conclude that the circuit court's $2,047,186 discount (from $10,235,931 to $8,188,745) was applied only to the non-cash assets, thereby lowering their value from $3,841,084 to $1,793,898 ($3,841,084–$2,047,186 = $1,793,898). That is a discount of non-cash assets of approximately 54%. Consider that the non-cash assets include land, land improvements and buildings with a cost basis of $2,720,348 and an adjusted net value of $1,755,000. Applying the 54% discount yields a "fair value" for the real property of $807,300, far less than one-third of the acquisition cost. It is this very type of windfall to the corporation and majority shareholders that the dissenters' rights statutes were designed to eliminate. See Swope, 243 F.3d at 493–94; see also Hollis, supra, at 141–42 ("[A]pplying a lack of marketability discount would allow the majority who approved the transaction to later buy out with a net gain what the minority dissenters have lost, granting the majority an unfair windfall."). The circuit court's appraisal deprived the dissenter of "fair value" as defined in KRS § 271B.13–010(3) and awarded the majority a windfall.

After carefully considering the dissent, I agree with the majority that Ford should be reversed and that we should reject fair market value and other marketability considerations as a factor in dissenters' rights stock valuations.

Having so concurred, however, I question the wisdom of allowing the introduction of evidence of the lack of marketability even under the single "exceptional circumstance" identified by the American Law Institute. See Hollis, supra, at 155 ("This exception is prone to judicial abuse and misinterpretation and should therefore be eliminated. This misuse can be readily seen as it was used by the New Jersey District Court and confirmed by the New Jersey Appellate Division in Lawson." (referencing Lawson Mardon Wheaton, Inc. v. Smith, 315 N.J.Super. 32, 716 A.2d 550, 567 (1998), rev'd 160 N.J. 383, 734 A.2d 738 (1999))). As the majority notes, there was no evidence that the exception would apply in this case. Therefore, we need not, and in my opinion should not, indicate that Kentucky courts should necessarily entertain the exception.

For these reasons, and with this final reservation, I concur.

---

8. For purposes of illustration, I presume the cash reserves were exactly $6,394,847 although, according to the circuit court, they were greater, making the non-cash assets equal to less than $3,841,084. Applying the precise figures would yield a more significant, and therefore more unreasonable, discounting of non-cash assets.

WINE, Judge, Concurring in Part and Dissenting in Part:

Except for the majority's decision to reverse the trial court's application of the twenty percent (20%) marketability discount, I concur. I join the dissent of Judge VanMeter to the extent that the trial court judgment shall be affirmed *in toto* and that at this time *Ford v. Courier–Journal Job Printing Co.*, 639 S.W.2d 553 (Ky.App.1982) should not be overruled. However, while well reasoned and well written, I do not join in the estate planning analysis engaged by Judge VanMeter as I believe such analysis is unnecessary to support the judgment of the Bell Circuit Court.

VANMETER, Judge, Dissenting:

I respectfully dissent. The majority opinion analyzes the state of the law governing a trial court's determination of "fair value" as mandated by KRS 271B.13–010, and reaches the conclusion that "marketability discounts are not applied in a dissenters' rights action involving a closely held corporation absent exceptional circumstances." Slip op. at 24. I do not disagree with that basic premise, but I do disagree with the application of that rule to the valuation of Brooks Furniture and the reversal of the trial court's valuation on this issue, because my reading of the trial court's appraisal is that it did not apply a marketability discount at the shareholder level.

As extensively quoted in the majority opinion:

In the statutory appraisal proceeding, the involuntary change of ownership caused by a merger requires as a matter of fairness that a dissenting shareholder be compensated for the loss of his proportionate interest in the business as an entity. The valuation focus under the appraisal statute is not the stock as a commodity, but rather the stock only as it represents a proportionate part of the enterprise as a whole. The question for the court becomes simple and direct: **What is the best price a single buyer could reasonably be expected to pay for the firm as an entirety? The court then prorates that value for the whole firm equally among all shares of its common stock.** The result is that all of those shares have the same fair value.

*In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d 997, 1004 (Me. 1989) (emphasis added). As I read the trial court's opinion, that it is exactly what it did. The trial court made the following explicit findings of fact:

In 1986, [Brooks Furniture] introduced glider rockers into its product line. The glider rocker was a huge success and sent [Brooks Furniture] on a run of profitability that lasted over ten years until competition with foreign manufacturers and huge discount stores such as Wal–Mart began to erode [Brooks Furniture]'s position in the glider rocker market. Between 1996 and November 30, 2004, gross sales declined yearly except for 2002, and the company began to operate in the red.

As a result, the trial court applied a marketability discount to the value of the entire corporation to account for the inherent risks of the corporation's business and the greater competition faced by the corporation over the last ten years, and the fact that any potential buyer of the corporation would view the business as a "high risk" venture.

The trial court correctly noted that *Ford v. Courier–Journal Job Printing Co.*, 639 S.W.2d 553 (Ky.App.1982), is the sole Kentucky opinion which addresses the issue of "fair value" in the context of a dissenting shareholder. While the majority opinion

criticizes the use of a "marketability discount" in the context of a net asset valuation, a careful reading of *Ford* reveals that value of that business was derived by appraisers considering three components: fair market value, earnings or investment value, and net assets value. The marketability discount was not applied to the shares of the dissenting shareholder. Rather the marketability discount applied to valuation of the corporation as a whole. The court in *Ford* clearly stated:

> The 25 per cent reduction in net asset value based on marketability was not an arbitrary or clearly erroneous figure. The appraisers noted in their report that in sales of some eight publicly held corporations there was an average of 24.2 per cent in discount from net asset value in similar sales.

> Nor do we feel that the discount herein was applied merely because of the minority position of the appellants. The report indicates that the "minority interest" would be a consideration in discarding the "earnings related approach" as unsound, but that the discount applied to the net asset approach was an "overall" or a "marketability discount," not a "minority" discount.

*Id.* at 556–57.

The majority opinion does not purport to overrule those aspects of *Ford* that requires "fair value" to be determined by the consideration of various means of determining value: market value, investment or earnings value and net asset value. *Id.* at 555. The criticism is that in this instance, because net asset value, as agreed by the appraisers, was the only appropriate means of valuing a money-losing business, the trial court erred in applying a lack of marketability discount to account for the facts that buyers of money-losing business are hard to find and those who can be found might want to discount the value of the assets to account for the risk.

Finally, I cannot help but observe that this case proves the adage that the best laid plans often go awry.[9] The record suggests that Jerry embarked on an estate tax minimization plan in the 1970s, at a time when estate tax rates were much higher than they are today. As a result, he gave, as found by the trial court, shares of stock in the corporation to his wife and children. As an aside, I would note that this fact alone distinguishes the current case from the vast majority of cases involving dissenters' rights; Hilton's "investment" in Brooks Furniture arises not by virtue of a *quid pro quo* exchange of consideration, but merely by virtue of his father's largess. Further, Hilton's realization of any value from Brooks Furniture arises solely from the efforts of his father and brother since 1979. But, I digress.

Initially, Jerry brought both Hilton and Michael into the business, but for whatever reason, Hilton decided his interests lay elsewhere and pursued a medical career. Michael remained in the family business with all its attendant benefits and burdens. Over time the business was generally successful, but ultimately faced increased competitive pressures such that sales declined and eventually the business operated in the red. In the early 2000s, Jerry, nearing retirement, was faced with an estate-planning scenario which was vastly different from the one he faced in the 1970s.

In this instance, even under the majority rule adopted by the majority opinion, I would recognize in this case that excep-

9. Robert Burns, *To a Mouse* (1785):

... foresight may be vain:
The best laid schemes o' Mice an' Men,

Gang aft agley,
An' lea'e us nought but grief an' pain,
For promis'd joy!

tional circumstances exist such that the discount applied by the trial court to the value of Brooks Furniture as a whole, *i.e.*, at the corporate level, was proper. The application of the rule set forth by the majority opinion punishes Jerry for doing nothing more than estate planning. I would affirm the judgment of the Bell Circuit Court.